# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* 84Partners LLC, | ) No. 3:14-CV-1256-J-32-PDB ) |
| | ) District Court Judge Timothy J. Corrigan |
| Plaintiff and Relator, | ) Magistrate Judge Patricia D. Barksdale |
| | ) |
| v. | ) |
| | ) |
| GENERAL DYNAMICS ELECTRIC BOAT, and | ) |
| HUNTINGTON INGALLS INDUSTRIES, | ) |
| NEWPORT NEWS SHIPBUILDING | ) |
| DIVISION, | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## I.    INTRODUCTION.

1.      *Qui Tam* Relator 84Partners LLC (hereinafter "Relator") brings this action on behalf of the United States of America and itself to recover damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.,* against Defendants Electric Boat Corporation ("EB"), and Newport News Shipbuilding, a division of Huntington Ingalls Industries, ("NNS") (collectively, "Defendants"). Defendants have submitted or caused the submission of false claims for payment to the United States, and made false records or statements material to false claims under government contracts for Navy vessels, including Virginia-class submarines, containing nonconforming parts, to include critically-important parts designated at the highest levels of quality assurance.

2.      The parts at issue are pipe fittings supplied by Defendants' subcontractors Nuflo, Inc. ("Nuflo") and Synergy Flow Systems, LLC ("SFS") which are installed on Navy vessels even though they do not conform to material provisions of Defendants' contracts with the United

States. These nonconformances relate to both the acceptance and installation of defective parts and to the acceptance and installation of parts produced in violation of material quality requirements. This complaint details conduct by Defendants that knowingly caused these nonconforming parts to be sold and delivered to the Unites States.

3.      Defendants' conduct resulted in false claims to the United States for parts they certified to be in conformance to drawings, specifications and required manufacturing and quality procedures, but were not, and were nonetheless installed in nuclear submarines and aircraft carriers delivered to the United States Navy.

4.      Defendants' conduct violated the False Claims Act, 31 U.S.C. 3729 *et seq*., and caused significant harm to the integrity of critically important military hardware upon which the United States relies for its national defense. Specifically, Defendants caused the Navy to incur massive expenses in inspecting, removing, and replacing defective Nuflo hardware, and caused prolonged delays in the delivery and launching of vessels.  Defendants' conduct has caused an enormous financial burden on the United States, and has caused the delivery and installation of thousands of nonconforming fittings on Navy vessels.

5.      Defendants knowing disregard of material quality assurance requirements under their contracts with the United States resulted in false claims for payment for the construction and delivery of nonconforming Navy vessels.

## II.   JURISDICTION AND VENUE.

6.      This action arises under the United States False Claims Act, 31 U.S.C. § 3729 *et seq*.

7.      This Court has jurisdiction of the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and has personal jurisdiction over Defendants, all of

whom do business in this District.

       8.      Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. §3732(a) because Defendants operate and transact business within this District.

       9.      The facts and circumstances alleged in Relator's complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media.

       10.     Relator is the original source of the information upon which its complaint is based, as that term is used in the False Claims Act and other laws at issue herein.

       11.     Prior to filing this action, Relator voluntarily disclosed to the United States the information on which its allegations are based. Additionally, should there have been a public disclosure of any aspect of these allegations prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

## III.   <u>PARTIES</u>.

       12.     The real party in interest to the claims set forth herein is the United States of America.

       13.     Relator 84Partners LLC is a Delaware corporation, whose members are personally aware of the fraud alleged. 84Partners LLC includes members Mickey Skobic and Joanne Skobic. Mickey Skobic is a Florida resident, who worked at Nuflo from 2005 to October 2014. Mr. Skobic worked as a welder and also became a Level II Nondestructive Testing ("NDT") inspector. Joanne Skobic is also a Florida resident, who worked at Nuflo between April 2, 2008 and October 2015. From 2008 to 2013, she held various positions, including cleaning

and lubricating pipe; operating grinders to deburr pipe; working in the shipping department; and staffing the tool room for the stocking and distribution of various tooling used by Nuflo employees. From about 2013 to 2015, although not properly certified as an inspector, she was also directed to start performing various quality inspections including verification of material composition, heat treatment, and critical dimensional checks.  84Partners LLC's members also included a former engineer for Electric Boat.

14.     Defendant Electric Boat Corporation is a Delaware corporation with its principal place of business in Groton, Connecticut.  EB is a wholly-owned subsidiary of General Dynamics Corporation. General Dynamics is a Delaware corporation with its principal place of business in Falls Church, Virginia.  Between 2003 and 2019, EB was awarded five multi-year contracts with the United States Navy for construction, final assembly, test and delivery of 38 Virginia-class nuclear submarines, at a total acquisition cost exceeding $65 billion, cumulatively. Defendants EB and NNS manufacture and deliver Virginia-class submarines to the United States under a joint production arrangement.

15.     General Dynamics' 2019 annual 10-k report states that "[m]ore than 90% of [the Marine Systems] segment is for Navy engineering, construction, and lifecycle support awarded under large, multi-year contracts."  The largest business unit in GD's Marines Systems segment is Electric Boat, which it touts as a "market-leading designer and builder of nuclear-powered submarines."  Based on its current annual report, roughly 65% of the revenue generated by GD's Marine Systems segment has been related to its nuclear-powered submarines.

16.     Defendant Newport News Shipbuilding, a division of Huntington Ingalls Industries, is a Delaware corporation with its principal place of business in Newport News, Virginia.  NNS is a division of Huntington Ingalls Industries ("HII") which was founded on

March 30, 2011, when Northrop Grumman Corporation divested its shipbuilding operations. HII is also a Delaware corporation with its principal place of business in Newport News, Virginia.

17.     In a fact sheet dated July 22, 2014, NNS described itself as "the nation's sole designer, builder and refueler of nuclear-powered aircraft carriers and one of only two shipyards capable of designing and building nuclear-powered submarines." HHI's 2019 Annual Report states that the company "conduct[s] most of [its] business with the U.S. Government, primarily the Department of Defense," and the "core business of [its] Newport News segment is designing and constructing nuclear-powered ships." HHI reports that "[o]f the 51 nuclear-powered fast-attack submarines currently in active service, 25 were delivered by Newport News."

18.     HII emphasizes that it "depend[s] heavily on a single customer, the U.S. Government" and that "substantially all of [its] revenues in 2018 were derived from products and services sold to the U.S. Government."  In 2016-2018, for example, 87-89% of HII's revenue was specifically derived from HII's contracts with the U.S. Navy.  HII also acknowledges that it "rel[ies] on third parties to provide raw materials, major components and sub-systems, hardware elements, and sub-assemblies for our products and to perform certain services we provide to our customers, and to do so in compliance with applicable laws and regulations."

19.     NNS (and its predecessor Northrop Grumman Ship Building) is the first-tier subcontractor to EB for the prime contract awards for Virginia-class submarines, working with EB pursuant to a Teaming Agreement to construct and deliver the submarines to the United States Navy.

## IV.     BACKGROUND

### A.     THE FALSE CLAIMS ACT.

20.     The False Claims Act ("FCA") was enacted in during the Civil War "at the

urgent request of President Lincoln, who was disturbed at contractors robbing the country during its time of travail." *U.S. v. Westinghouse Elec. Corp.*, 363 F. Supp. 1038, 1041-42 (W.D. Penn. 1973). When the original FCA fell into disuse after World War II, fraud permeated the defense contracting industry, with 45 of the 100 largest defense contractors, including nine of the largest 10, under investigation for multiple fraud offenses by 1985.  S. Rep. No. 99-345, 1986 U.S.C.C.A.N. 5266, at *2. In response to a similar trend across all Government contracting industries, the modern version of the FCA was implemented as a "coordinated effort of both the Government and the citizenry [to] decrease this wave of defrauding public funds."  *Id.* at *1.

21.     The FCA prohibits, inter alia, (a) knowingly presenting or causing to be presented false or fraudulent claims; (b) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and (c) conspiring to violate either of the preceding provisions. 31 U.S.C. § 3729(a)(1)(A)-(C). Any person who violates the FCA is liable for treble the amount of damages sustained by the United States plus civil penalties. Those penalties are $5,500 to $11,000 per violation for conduct that occurred on or before Nov. 2, 2015 and are presently set at $11,665 to $23,331 per violation for conduct that occurred after Nov. 2, 2015.  The penalty rate will continue to increase annually pursuant to the Federal Civil Penalties Inflation Adjustment Act of 2015, 28 U.S.C. § 2461, *et seq.*

22.     The FCA defines "knowingly" as "hav[ing] actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the information." 31 U.S.C. § 3729(b)(1). It requires no specific proof of specific intent to defraud. *Id.*

23.     The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

24.     Knowing noncompliance with material provisions of a government contract, including the quality assurance requirements, results in false claims in violation of the FCA.

## B.     <u>THE MILITARY CONTRACTS AT ISSUE.</u>

25.     EB and NNS are the only two builders of the Navy's Virginia-class submarines. Procurement for the Virginia-class submarines began in fiscal year 1998 under block buy or multiyear procurement contracts (with the exception of a single Virginia-class submarine procured in FY2003). Through FY2018, 28 submarines were procured. During FY2019-23, contracts for an additional 10 Virginia-class submarines procurements have been or will be awarded. Under these contracts, Defendants have built and delivered, and continue to build, Virginia-class nuclear-powered general-purpose attack submarines (referred to by the hull classification symbol "SSN") to the United States.

26.     The Virginia-class contracts have been awarded in five blocks, the first in 1999. Block I submarines were awarded under contract N00024-96-C-2100.  It originated as a letter contract on January 29, 1996.  That agreement was modified on May 9, 1996 and again on September 30, 1998.  The final contract acquired four Virginia-class submarines, at a price of about $4,200,000,000 ($4.2 billion).

27.     Prior to the finalization of Block II, in FY 2003, a single Virginia-class submarine was procured. Block II was awarded on or about August 14, 2003, and procured five Virginia-class submarines at a cost of approximately $9.4 billion under contract N00024-03-C-2101.

28.     Block III was awarded on or about December 22, 2008 for eight Virginia-class submarines, at a cost of approximately $14 billion, under contract N00024-09-C-2104/3. Block IV was awarded on or about April 28, 2014 for 10 Virginia-class submarines for approximately $16.4 billion under contract N00024-12-C-2115. Block V was awarded on or about December 2,

2019 for 10 Virginia-class submarines for $22.2 billion under contract N00024-17-C-2100.[1]

29.     EB is the prime contractor on the block buy contracts with the Navy for the construction, final assembly, test and delivery of Virginia-class submarines from 1999 through the present. A "prime contract" is "a contract or contractual action entered into by the Federal Government to obtain supplies, materials, equipment, or services of any kind." 41 U.S.C. § 8701(4).

30.     NNS is a first-tier subcontractor to EB. A "subcontract" is "a contract or contractual action entered into by a prime contractor or subcontractor to obtain supplies, materials, equipment, or services of any kind under a prime contract." 41 U.S.C. § 8701(7).

31.     EB and NNS have a Teaming Agreement on those contracts to build the submarines cooperatively. "Teaming Agreements" are governed by the Federal Acquisition Regulations, at 48 C.F.R. § 9.601, and arise, as relevant here, when "a potential prime contractor agrees with one or more companies to have them act as its subcontractor under a specified Government contract or acquisition program." *Id*. Under the 2018 arrangement, for example, NNS builds the stern, habitability spaces, machinery spaces, torpedo room, sail, and bow, while EB builds the engine room, control room, and pressure hull structure. Defendants alternate work on the reactor plant and the final assembly, testing, outfitting, and delivery of the submarines.

32.     In addition to its responsibilities as a subcontractor with respect to submarine construction, NNS is the prime contractor to the Navy for the construction and repair of Ford-class aircraft carriers. These responsibilities arise under contracts N00024-98-C-2104 (initially awarded on November 3, 1999 and providing for $4.5 billion for shipbuilding/repair of aircraft carriers); N00024-08-C-2110 (initially award on Sept. 19, 2008, and providing for approximately

---

[1] These approximate numbers are based on the base and exercised options value under these Firm Fixed Price Incentive Fee contracts.

$5.4 billion for shipbuilding/repair of aircraft carriers); and N00024-15-C-2114 (initially

awarded on June 5, 2015, and providing for approximately $3.35 billion for remaining

design/construction of CVN 79, the USS John F. Kennedy).

33.     EB and NNS employ thousands of subcontractors to manufacture parts and

provide services for their products.

34.     The Navy's nuclear vessels include extensive and complex systems of pipes and

valves. Some of these systems transport potable or waste water. Others are critical to the safety

and military readiness of the ship and crew, including weapons systems and hydraulics. Most

critically, of course, the nuclear propulsion systems of Virginia-class submarines require highly-

engineered and meticulously manufactured piping systems to transport high-pressure steam.

Thus, certain of the piping components installed on vessels are designated as "Level 1" and

"SUBSAFE" (further described *infra* Section IV.C.1), indicating that the part or system is

subject to the highest levels of quality assurance.

35.     Nuflo was at all material times a primary subcontractor to Defendants for pipe

fittings for Virginia class submarines and aircraft carriers. Nuflo manufactures, supplies and

distributes piping components including elbows, tees, couplings, bushings, flanges, pipe flanges,

tailpieces, threadpieces, nuts, adapters, deck drains, metallic tubes, stuffing tubes, vent & drains,

sleeves, sightglasses, hose assemblies, hydraulic cylinders, and seamless tubing.  Nuflo has

supplied more than 225,000 pipe fittings for use by the Navy. Nuflo-manufactured material is

installed in virtually all the piping systems on every Virginia-class submarine. Pursuant to its

subcontract with EB and NNS, Nuflo manufactured and delivered huge numbers of fraudulently

nonconforming piping system parts to Defendants.

36.     SFS was also a subcontractor to Defendants. SFS was created at the request of

Defendant NNS after Nuflo was suspended by NNS from a program that had authorized Nuflo to inspect and accept their own product with the same authority of these prime contractors. SFS shared 50% ownership with Nuflo shareholders. In a warehouse location near NNS, SFS distributed Nuflo products. It had no manufacturing capability and lacked the capability to control quality processes and procedures taking place at the Nuflo. The use of SFS was another mechanism to evade the quality requirements under which Defendants were obligated.

### C.     THE QUALITY REQUIREMENTS AT ISSUE.

37.     Military weapons systems are required by the Navy to be constructed to exacting standards in precisely controlled manufacturing environments. The contracts at issue required that Defendants supply vessels to the United States, including all the vessels' components which conform precisely and completely with all requirements of that contract, including stringent quality-assurance requirements.

38.     These requirements are non-delegable. If a contractor chooses to hire subcontractors to perform any part of its contract with the United States, it nonetheless remains obligated to the United States to provide an end item which conforms in all respects to the requirements of the contract. Thus, while prime contractors are required to "flow down" its quality requirements to subcontractors, such as Nuflo and SFS, they retain ultimate responsible for the delivery of conforming end-products.

### 1.     SUBSAFE and Level 1 Requirements Applicable to Defendants.

39.     Many of these stringent quality control requirements resulted directly from action taken after the sinking of the fast-attack nuclear submarine USS *Thresher* (SSN-593) on April 9, 1963. All 129 souls aboard were lost that day. The USS *Thresher* was the first nuclear-powered submarine lost at sea, and the largest loss of life in the submarine force's history.

-10-

40.     The Navy attributes the sinking of the USS *Thresher* to, among other deficiencies, the possibility that more than 400 piping joints on the *Thresher* were substandard, and that some of them failed, resulting in flooding in the engine room. Statement of Rear Admiral Paul E. Sullivan, U.S. Navy Deputy Commander for Ship Design, Integration, and Engineering, Naval Sea Systems Command, Before the House Science Committee on the Subsafe Program, October 29, 2013, *available at* https://www.navy.mil/navydata/testimony/safety/sullivan031029.txt.

41.     Within weeks after the loss of the *Thresher*, the Navy established the Submarine Safety ("SUBSAFE") program, which has become a worldwide model for safety and quality assurance. By imposing a strict quality control processes and material control requirements throughout a submarine's service life, the SUBSAFE program was instituted to help ensure the safety of the crew members, and that tragedies like the *Thresher* are not repeated.

42.     The legacy of *Thresher,* and the importance of the SUBSAFE program, is stated on the website of the *Thresher* memorial organization:[2]

> The purpose of the SUBSAFE Program is to provide maximum reasonable assurance of watertight integrity and recovery capability of a Submarine. A culture of Safety is central to the entire Navy submarine community. This starts at the designers, and includes builders, operational crews as well as maintenance organizations. The SUBSAFE Program clearly defines non-negotiable requirements, requires annual training of personnel and then ensures compliance with reviews including audits and independent oversight. The annual training requirement includes review of past failures including the loss of Thresher.
>
> In order to submerge, a submarine must be SUBSAFE certified. This is a process, not just a final step. SUBSAFE certification covers design, installed material, fabrication processes and as well as comprehensive testing. In these areas, documentation must be exact and based on objective quality evidence. This means that records back to original material composition as well as detailed testing results must be reviewed and retained throughout the life of a submarine.

---

[2] https://threshermemorial.org/the-legacy.html (last viewed January 29, 2020).

To many the detailed requirements, rigorous training, constant review and questioning attitude, as well as the meticulous record keeping may seem excessive, but the program is successful.  In the 48 years before SUBSAFE there were 16 non-combat related submarine losses, an average of one every three years.  Since inception of the SUBSAFE program only one submarine, USS Scorpion SSN 589 – has been lost, and it was not a SUBSAFE certified submarine.  In the 50 years since the inception of the SUBSAFE program, there has not been a loss of a SUBSAFE certified submarine.   The SUBSAFE program has been utilized as a safety standard when analyzing the loss both Space Shuttles Challenger and Columbia.

The SUBSAFE Program is the legacy of those lost on USS Thresher – and it has made a lasting significant contribution to the Submarine Force, the United States Navy and to our Nation.

43.      SUBSAFE requirements apply to all structures, systems, and components critical to the watertight integrity and recovery capability of the submarine, called the SUBSAFE Certification Boundary.  Such structures, systems, and components are designated as "SUBSAFE," and include many of the pipes and fittings at issue in this case.

44.      Defendants are required to certify to the United States compliance with the SUBSAFE program.  SUBSAFE requirements are invoked in the design and construction contracts for all new submarines, in the work package for submarines undergoing depot maintenance periods, and in the Joint Fleet Maintenance Manual for operating submarines.

45.      The SUBSAFE program is tethered to the specific  requirements of the SUBSAFE Manual (NAVSEA 0924-062-0010).  Materials and work on SUBSAFE product are strictly controlled to ensure that all aspects of such products (design, materials, work, inspection, etc.) are of the highest quality.  SUBSAFE components require certification based on traceable, observable quality evidence, or "OQE," which tracks the item from the point of origin (including all records of the creation of the product, i.e. source materials as well as smelting and hardening process for metals) to the point of installation within a SUBSAFE boundary. OQE provides proof that deliberate steps were taken to comply with requirements, and it and is retained for the

life of the submarine.  These measures are included in the cost of submarine construction and maintenance.

46.      Level 1 designation is also given to components which are not within the SUBSAFE boundary but for which the Navy requires a maximum degree of assurance that the chemical composition and mechanical properties of the installed material meets the specified requirements.  The Navy Maintenance Manual describes Level 1 as:

> LI (Level I) An item that supports either a SUBSAFE or Level I system that has undergone the extreme material control/QA techniques that provide OQE of its acceptance for its appropriate application. Each item has certification papers (or special markings that provide traceability to the certification) that pedigree its material and physical properties, provide traceability to manufacturer, contract list and lot, and document the QA system/test requirements applied to the item.

47.      Level 1 and SUBSAFE are the highest levels of quality assurance and control. Exacting conformity to required specifications and diligent oversight, inspection, and audit are essential components of both SUBSAFE and Level 1 implementation.

48.      Both Defendants systematically failed to conduct appropriate, sufficient inspection, oversight and audit of both the manufacturing and inspection practices of Nuflo and SFS.  As a direct and proximate result of Defendants' failures, Nuflo's systematic disregard for manufacturing and quality requirements did not just go unchecked, but accelerated throughout the period of Virginia-class construction.  Consequently, myriad piping components were installed on Naval vessels which were falsely certified under a conforming quality system, and thousands of which were nonconforming due to improper or undocumented weld repairs, use of improper materials, failure to document proper inspections, among other serious and systematic breakdowns.

49.      The Defendants were required to, and did, certify to the United States that the products incorporated in submarines and aircraft carriers containing Nuflo hardware conformed

-13-

to design, quality, material, and all other requirements established by SUBSAFE and Level 1. Because the hardware did not conform to these requirements, claims for payment which included nonconforming Nuflo hardware were materially false.

### 2.     Other Material Quality Requirements Applicable to Defendants.

50.     Each contract between the United States and a prime contractor requires that the contractor implement specific quality assurance, manufacture, inspection procedures and processes, tightly controlled by detailed and documented procedures, which ensure that United States vessels, including all their components, conform precisely and completely with all requirements of that contract.

51.     Both Defendants contractually agreed to follow these quality control and assurance system requirements.

52.     Section 090 of the Virginia Class Ship Specification requires shipbuilders to have a quality system in accordance with MIL-Q-9858A, Amendment 2, or International Quality Standard ("ISO") 9001. As such, both EB and NNS have both certified that their quality control systems are in accordance with Mil-Q-9858A, Amendment 2, and IS0 9001. Defendants' Purchase Orders require, as they must, its subcontractors  Nuflo and SFS also meet Mil-Q or ISO quality requirements.

53.     Every quality assurance system standard has, at its core, the contractual promise that the supplier will perform the source-qualification, audit, inspection and oversight necessary to deliver conforming product to the United States.

54.     Military Specification MIL-Q-9858A (Quality Program Requirements) was first issued as MIL-Q-9858 on April 9, 1959 and revised to MIL-Q-9858A on December16, 1963. It

is the origin of the ISO 9001 standard and all other quality management system standards and regulations.

55.     MIL-Q-9858A "requires that "[a]ll supplies and services under the contract, whether manufactured or performed within the contractor's plant or at any other source, shall be controlled at all points necessary to assure conformance to contractual requirements."

56.     MIL-Q-9858A precisely defines the responsibility of the prime contractors (or, as here, the Teaming Agreement members) for the control of purchases. Section 5, Control of Purchases, states: "The contractor is responsible for assuring that all supplies and services procured from his suppliers (subcontractors and vendors) conform to the contract requirements."

57.     ISO 9001 was initially implemented in the 1990s.[3] ISO 9001 builds on MIL-Q-9858A. Similar to the MIL-Q, ISO 9001 specifies requirements for a quality management system when an organization:

> a) needs to demonstrate its ability to consistently provide products and services that meet customer and applicable statutory and regulatory requirements, and

> b) aims to enhance customer satisfaction through the effective application of the system, including processes for improvement of the system and the assurance of conformity to customer and applicable statutory and regulatory requirements.

ISO 9001:2015 Abstract.

58.     These standards are robust, and require that organizations exert control through and over their own processes, as well as the processes of their subcontractors.  As the United

---

[3] Over time, ISO 9001 has replaced many Mil-Q references in new DoD contracts. MIL-Q-9858A was withdrawn by DoD in 1996, but is still used throughout the industry as a baseline standard, and the Government has discretion to permit companies to certify to either quality system standard. Whether applicable standards are set forth under MIL-Q or ISO 9001, all quality-assurance systems have a single goal:  Delivery of conforming products which, particularly in the case of SUBSAFE components, meet all contractual, drawing, and inspection requirements.

States Court of Federal Claims has observed: "Unlike reliance on brand name or independent

laboratory testing, 9858A is the mechanism by which the military assures itself that it is buying

quality goods. 9858A requires rigid adherence to quality standards for each individual piece of

any given hardware item." *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 77

(2000).

59.     Clause 4.1 of ISO 9001 (a quality-assurance methodology to which both

Defendants are required by contract to adhere, and with which they certify compliance)

mandates:

> Where an organization chooses to outsource any process that affects product
> conformity to requirements, the organization shall ensure control over such
> processes. The type and extent of control to be applied to these outsourced
> processes shall be defined within the quality management system.

60.     Note 3 to this clause makes clear that contractors cannot simply abdicate

conformance to vendors like Nuflo: "Ensuring control over outsourced processes does not

absolve the organization of the responsibility of conformity to all customer, statutory and

regulatory requirements."

61.     ISO 9001 specifically requires that prime contractors such as Defendants will

exert more control over their subcontractors when the subcontractors' adherence to requirements

can affect product conformance. As specified in ISO 9001's instructions, "[t]he organization's

control of the outsourced process has to be based on the need for product conformity to

requirements."

62.     MIL-Q-9858A, at § 2.1, specifically incorporates by reference two equally-

critical specifications as "a part of this specification[.]" The first is Military Inspection Standard

MIL-I-45208, "Inspection System Requirements." MIL-I-45208 requires contractors to

implement and perform all inspections necessary to ensure that parts meet contractual

requirements for, *e.g.*, materials, manufacturing, scrap, and rework. Chief among these requirements include the following provisions:

> The contractor shall provide and maintain an inspection system which will assure that all supplies and services submitted to the Government for acceptance conform to contract requirements…

> The contractor shall perform or have performed the inspections and tests required to substantiate product conformance to drawing, specifications, and contract requirements…

> The inspection system shall be subject to disapproval if changes thereto would result in nonconforming product.

Mil-I-45208A Am 1, Section 3.1.

63.     With respect to the required handling of nonconforming material, MIL-I-45208 requires the Defendants to "establish and maintain an effective and positive system for controlling nonconforming material, including procedures for the identification, segregation, presentation and disposition of reworked or repaired material" pursuant to systems and procedures which are "documented [and] acceptable to the Government."

64.     Defendants' Purchase Orders to Nuflo and Synergy required conformance to Mil-Q-Q-45208A (or compliance with 45208A through utilization of an ISO 9001 or Mil-Q-9858A program).

65.      Welding is a critical element of the manufacture of weapons systems, including Navy ships, and unauthorized and undocumented welding is at the heart of this case.

66.     Nuflo was required to perform all welding operations, including but not limited to repair welds, in accordance with NAVSEA Technical Publication, "Requirements for Fabrication Welding and Inspection, and Casting Inspection and Repair for Machinery, Piping, and Pressure Vessels, Publication S9074-AR-GIB-010A/278 (issued August 1, 1995, Change A issued February 14, 2013). This specification, which is 164 pages, "contains the welding and allied

processes (except brazing) and casting requirements including inspection for the fabrication, alteration, or repair of any item or component of machinery, piping, and pressure vessels in ships of the United States Navy." This specification follows MIL-STD-278F, issued by NAVSEA in 1987. This document "provides instructions for the fabrication, welding, and inspection of machinery, piping, and pressure vessels in ships of the United States Navy. It also contains requirements for the inspection and repair welding of castings." *Id.* at 3. NAVSEA S9074-AR-GIB-010/278.

67.     Relevant to welding are many other quality standards including MIL-STD-248, Welding And Brazing Procedure And Performance Qualification, MIL-STD-271, Nondestructive Testing Requirements of Metals, and MIL-STD-2035, Nondestructive Testing Acceptance Procedure.

68.     At bottom, these standards require that every weld be performed according to an authorized procedure, be carefully documented, and accompanied by certification that non-destructive testing evidenced the conformity of the weld to contract requirements.

69.     These standards, when properly implemented together with a properly-functioning quality system, constitute a comprehensive environment to ensure that personnel who perform welding operations are properly trained, qualified, and certified by their employer; that welding is done precisely as required by contract; and that welds are inspected carefully and comprehensively to ensure their integrity.

70.     Per these standards, Defendants required in its purchase orders to Nuflo and SFS that welding, nondestructive testing, and other testing procedures performed by vendors must be approved on a Vendor Procedure Approval Request ("VPAR") Form prior to delivery of parts. Defendants further required in its purchase orders to Nuflo and SFS that all welding on Level 1

and SUBSAFE parts be accomplished in accordance with weld procedures and drawing requirements, and all weld records must be provided by the subcontractor who performs the work. Finally, all departures from specified requirements had to be approved through a Vendor Information Request or "VIR." Welding/brazing fabrication was not authorized without written authorization and approval of specific procedures by the shipbuilders.

71. As all these standards make plain, a critical component of the quality assurance systems required by the Department of Defense for military end items is the value of the documentation showing that each Level 1 component conformed to specification and has "traceability."

72. As defined by the Naval Sea Systems Command ("NAVSEA"):

The process of establishing traceability exists from the time the operation is performed until final shipboard installation, at which time the traceable nomenclature is documented on an installation record. Traceability establishes documented evidence that the item supplied was manufactured and/or maintained in full compliance with the specifications, drawings, storage, packaging and handling requirements, and other associated requirements as required.

NAVSEA Instruction 9078.1, May 1, 2007.

73. Traceability establishes an evidence trail for Level 1 parts, which permits the manufacturer, the prime contractor, and the United States to verify with confidence that materials conform to requirements, that outsourced vendors are properly qualified and do proper work, that required processes were performed in proper sequence, that all operations were performed by qualified and properly-certified personnel and that required testing and inspections were performed in proper sequence.

74. Importantly, traceability also allows the government to trace items back through the manufacturing process in the event of item failure. The Government pays a premium for this ability, such that the objective evidence of conformance to contractual specifications which

-19-

accompanies every delivered component is essential to the Government's ability to rely on the integrity of what is installed on military equipment.

75.     Thus, with respect to the shipbuilder's oversight of suppliers like Nuflo and SFS, identification of nonconforming parts or processes, and root cause and corrective action analysis with respect to every nonconformance, and documentation of the same, was not just contractually-obligated under required quality management standards, but critical to what the Government bargained for.

> **D.**     **THE PAST IS REPEATED: DEFENDANTS' PREVIOUS EXPERIENCE WITH NONCONFORMING SUPPLIER PARTS ON NAVY VESSELS.**

76.      On March 16, 2001, a *qui tam* action was filed against these and other defendants regarding the acquisition, from Hunt Valve Company of Salem, Ohio, of non-conforming and potentially dangerously defective valves for use in Navy nuclear submarines and surface vessels. *United States ex rel. Tina Gonter, et al. v. General Dynamics, Marine Systems Division, Electric Boat*, Civil Action No. 4:01CV634 (N.D. Ohio).

77.     The gravamen of the complaint in that case was that Hunt Valve, then a major supplier of valves for the Navy's submarine program, falsely certified that it had manufactured valves for those vessels in accordance with contract requirements, including quality assurance, inspection, and certification failures.  With respect to the defendants in this matter, the *Gonter* complaints alleged that they failed to engage oversight which the United States paid them to accomplish, failed to follow their own quality assurance programs and contract requirements, and submitted claims for payment which they knew or should have known were false as a result of their failure to deliver conforming vessels to the United States as a result of Hunt Valve's defalcations.

78.     The Department of Defense investigated that case for several years, culminating in (1) the indictment, conviction, and imprisonment, on Major Fraud charges, of two senior executives with the company; (2) a settlement agreement between the United States and Hunt Valve; and (3) a settlement agreement between the defendants in this case, the United States, and the Relators.

79.     The last of these settlements was finalized in March 2006, and the case was dismissed on March 21, 2006.

80.     Shortly after the *Hunt Valve* case was resolved, Defendants elevated the pipe contractor whose conduct underlies the allegations of this case, Nuflo, Inc. of Jacksonville, to a preferred contractor status which transferred day-to-day oversight of the supplier from the shipbuilders to the supplier itself.  As a result, Nuflo personnel, including its president John Licausi, were granted authority to inspect and accept material on behalf of the shipbuilder defendants. Nuflo's distributor, SFS was also delegated authority by the shipbuilders to inspect and accept material on behalf of the shipbuilders.

81.     As detailed later in this Amended Complaint, Nuflo exhibited many of the same serious problems as Hunt Valve, also resulting in the delivery to the United States of defective submarine hardware.

82.     For example, the vendor welding malfeasance identified in *Hunt Valve* included requiring uncertified and unqualified welders to weld Level 1 and SUBSAFE and other parts; welding on parts which were not accompanied by appropriate production travelers; welding on Level 1 and SUBSAFE parts without, inter alia, (1) required defect documentation and engineering analysis, (2) proper authorization from the shipyard defendants; (2) proper defect identification and requisite quality documentation, (4) proper planning documentation, including

-21-

drawings and specifications for the repair welds; (5) proper recordation that the weld repair occurred; and (6) proper nondestructive testing of the weld repairs; routine failure to excavate cracks prior to weld repair; use of improper weld rods; maintenance of false welding logs.

83.     Another of the abuses in the *Hunt Valve* matter which mirrors closely those alleged here is the use of a phony middleman to serve as a "distributor." In the *Hunt* matter, that was an entity named All-Stainless, Inc., which posed as a distributor of Hunt product even though it did no more than take orders.  Here, that entity has common ownership with Nuflo and is called SFS.  SFS was created at the express direction of the shipyard defendants, who used SFS as a vehicle to order Nuflo parts during a period when Nuflo was suspended as a result of quality problems with its Virginia-class parts.

84.     This Complaint details extensive failures in oversight by the Defendants here, each of which had not only the immediate investigation of their practices and procedures pursuant to the Hunt Valve investigation, but, beginning almost immediately after that matter resolved, were presented with a series of "red flag" warnings that extensive problems surrounded the production of pipe components at Nuflo.

85.     The *Hunt Valve* matter informs the deliberate and reckless nature of Defendants' conduct in this matter, which allowed additional suppliers' components to be introduced into many years of Navy vessel construction.

E.     **SETTLEMENTS WITH FORMER DEFENDANTS NUFLO AND SFS**.

86.     In July 2017, Nuflo reached a settlement with the United States and Relator to resolve claims arising from Nuflo's knowing direct and indirect delivery of non-conforming parts to the Navy during the period from January 1, 2008 through May 1, 2016.

87.     At or around the same date, Relator also entered into an agreement of compromise

with SFS based on its shared ownership with Nuflo and its approach to United States and Relator

based on a financial inability to pay the full value of claims against it.

88.     These settlements preserved all claims against the remaining defendants.

## V.     FACTUAL ALLEGATIONS.

89.     Defendants submitted or caused the submission  of claims to the United States

Navy for pipe fittings delivered to the United States and installed on Navy vessels which were

nonconforming to material quality assurance requirements due to systemic manufacturing and

quality failures, including at least the following:

- Performance of improper welds;

- Performance of welding by unqualified welders;

- Failure to record rework on welding repairs;

- Failure to maintain materials traceability;

- Falsification of inspection reports;

- Requiring unqualified personnel to perform quality inspections;

- Failure to perform quality inspections; and

- Other systemic quality failures, such as improper material control and using
  uncalibrated or improperly-calibrated testing and measuring equipment.

90.      These failures are described in more detail below.

## A.     DEFENDANTS ARE LIABLE FOR THE SYSTEMIC QUALITY
CONTROL FAILURES OF SUPPLIERS NUFLO AND SFS.

91.     Defendants are required by their contracts with the United States to ensure that all

parts delivered to the United States be manufactured, assembled, tested and inspected in an

environment controlled by a quality control system.  These requirements are material to payment

and flowed down to Nuflo and/or SFS though purchase orders between the prime contractors and

Nuflo and/or SFS. The purchase orders flow down requirements from the prime contracts, including drawing references, material specifications (to include heat-treat requirements), testing requirements, and quality requirements.

92. Defendants did not ensure that Nuflo promulgated and complied with a proper quality system. Rather, for a least a decade, Nuflo regularly and intentionally falsified records purporting to show that parts were properly manufactured, assembled, inspected and tested when they were not. Nuflo routinely covered up defects in materials with unauthorized and undocumented weld repair, and falsified inspection, testing, and certification.

93. Defendants failed to oversee Nuflo's practices and ignored many warnings of out-of-control manufacturing and quality systems. Even as Nuflo was producing and delivering nonconforming products, Defendants permitted Nuflo to police itself by designating its personnel as inspectors on Defendants' behalf under a Supplier Delegated Inspector Program ("SDIP"). When NNS disqualified Nuflo from that program in 2007, Defendants permitted a work-around by allowing distribution of Nuflo product through SFS, an entity with common ownership to Nuflo and no meaningful distinction from Nuflo from a quality control perspective.

94. As a result of Defendants' abdication of their quality control responsibilities, piping components manufactured and/or assembled by Nuflo to Defendants EB and NNS were nonconforming to contract requirements and installed on Navy submarines and carriers.

95. The cataclysmic breakdown of Nuflo's quality system is exemplified by at least the following categories of failures: (1) undocumented and unauthorized weld repairs to falsify conformances; (2) falsified heat treat numbers; (3) failure to perform required inspection and testing; (4) unqualified personnel and improper inspections; and (5) falsification of records.

### 1.  Undocumented and Unauthorized Weld Repairs to Falsify Conformances.

96.     From at least 2005 through 2015, Nuflo management routinely ordered the two welders in its employ to perform weld repair operations with the intent to push parts through production and meet completion dates set by Defendants.

97.     Nuflo produces these parts directly or through subcontracts in processes such as forging, machining from bar stock and cold forming. These parts can be made from metals or metal alloys including Carbon Steel, Inconel, 300 Series CRES (chromium-nickel alloys), CuNi (copper nickel alloys) and NiCu (nickel-copper alloys, to include "monel," which contain at least 52% nickel). Elbow-type parts, which were often the subject of Nuflo weld repair, are manufactured through cold forming, wherein Nuflo uses a proprietary process involving pushing a tube/pipe through a cold-formed die to form the elbow. Nuflo's proprietary process can result in splitting, cracking or galling[4] and frequently led Nuflo management personnel to direct Nuflo welders to perform unapproved and nearly always undocumented weld repairs. Weld repairs were not limited to elbows, but were also performed on reducers, flanges, tees and other parts that Nuflo delivered to Defendants.

98.     Defendants were aware that Nuflo used this process, and that it created splitting and cracking of parts.

99.     These weld repairs were often personally directed by Nuflo President John Licausi, his son Ryan Licausi, and two Quality Managers, Steve Cefalu (deceased) and Chris Moore, who would walk parts to the welders and give verbal instructions for weld repair. These

---

[4] Galling is a form of surface damage arising between sliding solids, distinguished by macroscopic, usually localized, roughening and creation of protrusion above the original surface; it often includes material transfer, or plastic flow, or both. American Society for Testing and Materials (now known as ASTM International), Publication ASTM G40.

individuals were also Supplier Delegated Inspectors ("SDI"), authorized by EB and NNS to inspect parts on their behalf.

100.    The majority of these welds were egregiously out of conformance with the rigorous quality requirements expected for military end item components.  For example, Nuflo management required its welders to:

- Weld over cracks, without documentation or proper non-destructive examination to ensure the part was conforming to specification;

- Weld on base metals for which they were not qualified

- Weld on parts for which purchase order specifications expressly prohibited any welding;

- Weld in locations where the drawing did not permit welding, such as on the end preps of parts;

- Use weld wire to build wall thickness; and

- Use weld wire to fabricate parts such as flanges and sockets, without disclosing to the United States that the parts were made from material that had no traceability to a heat-treat lot, while falsifying or omitting certification of the source material.

101.    These weld repairs were routinely effectuated, *inter alia,* without any documentation of the reason the weld repair was necessary; without the corrective action necessary to preclude repetition of the same nonconformance; without any engineering analysis to demonstrate that the repair was consistent with drawing requirements and sound welding practices; without any welding plan delineating the repair and setting forth the procedures to be used; without any specification of the weld rods, filler materials, or techniques to be used; without a drawing or photographic evidence showing the nonconformance location or severity; without documentation of the certification of the welders to perform the repairs; without documentation of the repairs prior to their being machined to disguise them; without any documentation of nondestructive testing to show that the repair was effective; and without any

-26-

documentation showing that a weld repair had taken place.

102.   Weld repair is only authorized pursuant to specific approved procedures. If repairs were contemplated, Nuflo was required to develop and submit welding procedures to the shipbuilders for approval and then follow and document all such repairs.

103.   Nuflo received approval for one weld procedure, WPS NUC CUNI 1000.1, which was limited to specific base metals, was not permitted for steam service application, and did not cover carbon or stainless steel parts.

104.   This weld procedure mandated compliance with NAVSEA S9074-AR-GIB-010/278, and only permitted repairs and weld buildup under specific conditions and with specific buildup dimensions.  The maximum weld depth for buildup or repair welds was 0.375 inches.

105.   Nuflo did not follow WPS NUC CUNI 1000.1, including by welding parts outside its parameters and by failing to document weld repairs in accordance with NAVSEA S9074-AR-GIB-010/278.

106.   By weld repairing defects without approval or failing to document weld repairs which may have been permitted, Nuflo destroys the traceability of the parts at issue and conceals manufacturing problems that cause or contribute to the need for weld repairs in the first place. Such welding renders the part nonconforming to contract requirements.

107.    Nuflo delivered parts to Defendants which exhibited, among other nonconformances, undetected magnetic-particle indications on dozens of parts; hundreds of parts with minimum-wall-thickness violations (meaning that the walls of the parts were thinner than allowed by the drawings), at least 33 of which were 10% or more below requirements and thus within the "technical range of interest;" unauthorized welding on an unknown number of parts; and at least two parts with incomplete weld repairs characterized as through-wall repairs.

-27-

Additionally, Nuflo delivered to Defendants huge numbers of parts with false certifications of conformance.

108.    Though Nuflo did not require its welders to maintain contemporaneous records of the weld repairs they were directed to perform, Mr. Skobic kept personal 'journals to record his work.  These journals, summarized in Section V.C.3. of this Complaint, document improper welding on *thousands* of individual parts delivered to Defendants; improper or nonexistent weld procedures; improper or nonexistent control of welding rods, in violation of Navy welding requirements; and other violations of requirements.

109.    Nuflo routinely made weld repairs without generating welding sketches, without documenting weld repairs on parts travelers or using documentation such as repair travelers, meaning that such repair welds are not traceable. Measurements which detail the exact location and dimensions of defects are not recorded in a majority of cases. When required, approved procedures to perform the repairs were not obtained. Any sketches of repairs that did exist were never reviewed or initialed by Nuflo welders, an omission which should have prompted immediate response by Defendants but which Defendants never acknowledged.

110.    Further, even when welding might be an appropriate corrective action for a properly-documented nonconformance in a part, the quality requirements of Defendants' contracts and the overarching mandate of complete traceability require that nonconformances be properly documented in a rejection record; that the planned weld repair be documented by work order; and inspected pursuant to the dictates of the quality system. However, in the overwhelming majority of cases neither the defect nor the weld repair is recorded by Nuflo, another omission which should have drawn Defendants attention and demanded a corrective action, but which Defendants largely ignored.

111.     By way of example, Purchase Order No. PPA107-039, issued by SFS to Nuflo on June 23, 2014, for delivery of elbows to Northrop Grumman Ship Building (NNS's predecessor), provides at p.16 that "A copy of all welding records, including repairs, shall be submitted" in accordance with MIL-STD-278, with higher requirements for Level 1 items.  The purpose and intent of this requirement is to ensure traceability with respect to all weld repairs.  NNS's failure to require, review and retain accurate welding records is a failure of their responsibility to exercise oversight over Nuflo's manufacturing process.

112.     Notwithstanding these requirements, Nuflo performed undocumented or unauthorized weld repairs on many types of parts elbows, flanges, tees, laterals, reducers, sweeps, pipes, and other products that it delivered to the Government and Defendants.

113.     Nuflo management ordered its welders to engage in each of these practices since at least 2005 although one welder, Enrique Cintra, began full time employment with Nuflo in November 2001.  Mr. Cintra was born in Cuba and became a lawful permanent resident of the United States in approximately 1996.  Mr. Cintra's welding experience resulted primarily from training received in Cuba, working as a welder in Cuba and then working as a welder in the United States for approximately four years before he was hired at Nuflo.  Mr. Cintra speaks very little English, cannot write in English, and can read only a little English.  He was directed by Nuflo to perform welding operations primarily by himself from his hire through 2005, including welding on Level 1 and SUBSAFE items to be supplied to Defendants for use in Navy nuclear submarines.

114.     Until the hire of Mr. Skobic as a full-time welder in 2005, Mr. Cintra performed welding every day. After the hire of Mr. Skobic, Mr. Cintra continued as a full-time welder.

115.     Mr. Skobic's personal journal meticulously documented his work, including the

weld repair directed by his Nuflo supervisors. Mr. Skobic's journal entries yield a very conservative estimate of parts he weld-repaired during the period May 2006 to October 2013 of nearly 4,000 items. While there is no similar documentation of the weld repairs Mr. Cintra made when he was the sole welder for Nuflo or during the period after Mr. Skobic was hired, there is significant basis to conclude that Mr. Cintra also performed large numbers of unknown and unauthorized repairs per the direction of Nuflo officers and managers. The following entry recorded in Mr. Skobic's journal on June 11, 2006 is highly suggestive that Mr. Cintra knew there were improper weld repairs prior to Mr. Skobic's hire: "About 1:55, took a picture of a print for a 8" flange for Eboat for a submarine which was illegally welded on the ends.  If I can, tomorrow, I will take a picture of the flange so I have it as proof as what JL and Tommy[5] have me doing.  This already 4 or 5 times since I came on this side and Enrique told me that they have done this [s***] before."

116.    Nuflo's failure to generate documentation for the vast majority of welding in its facility renders those weld repairs untraceable, in violation of the contractual specifications for Level 1 and SUBSAFE parts supplied to the United States.  The lack of proper documentation and the resulting failure to meet traceability requirements for Level 1 and SUBSAFE parts make it impossible to determine exactly which components were and were not improperly welded.

117.    These omissions were so egregious that, had Defendants exercised appropriate oversight as required by their obligations to the United States, they would have known that Nuflo's quality system was wholly out of control and that parts manufactured by Nuflo were nonconforming.

---

[5] "JL" is an abbreviation for John Licausi, Nuflo's president and an authorized SDIP inspector.  "Tommy" is an abbreviation for Tommy Connor, a Shop Foreman and Mr. Skobic's immediate supervisor at this time.

118.    Defendants had ample red flags to know that Nuflo was delivering nonconforming documentation and nonconforming parts, but rather than taking the time required to engage in proper fact-finding and corrective action analysis and implementation, they not only ignored those red flags, but applied near-continuous pressure to Nuflo to deliver parts quickly so that their construction schedules would hold.

**2.    Falsified Heat Treat Numbers.**

119.    Heat-lot or "heat treat" numbers, are codes assigned by raw-material providers to identify the lot of material from which a product is forged or cast. Accurate heat treat numbers must be recorded for Level 1 and SUBSAFE products, consistent with the obligation to document cradle-to-grave traceability of a product.  Material validation is required to ensure that parts are manufactured from the specified materials.

120.    Nuflo routinely failed to maintain documentation and physical control of materials sufficient to establish products' heat treat numbers.  Rather, it intentionally changed heat-lot numbers on products.  Nuflo management routinely instructed its quality inspectors to change heat-lot numbers on parts to reflect conformity to requirements without verifying the conformance of the material to requirements by testing its chemical properties and without documenting the changed number, thus destroying accurate traceability for the product.

121.    Nuflo's failure to maintain accurate traceability information for Level 1 and SUBSAFE parts is a material violation of the specifications in its contracts with EB and NNS. However, despite their oversight obligations, neither EB nor NNS regularly conducted tests comparing the chemical properties recorded by Nuflo with the actual chemical properties of the delivered parts.

### 3.      **Failure to Perform Required Testing.**

122.      Government contractors validate the conformance of components to contract specifications and drawing requirements through various forms of nondestructive testing ("NDT").  Such methods of validation and verification are specified in the quality requirements flowed down to Nuflo by Defendants.  Notwithstanding these requirements, Nuflo routinely failed to conduct required NDT and Defendants routinely failed to require such testing.

123.      Nuflo omitted or cut corners on virtually all forms of NDT that it was obligated to perform. Liquid penetrant testing ("LPT") – a process of flowing a fluorescing medium across the surface of the part and examining it under ultraviolet light in order to inspect for variations in the surface of metal parts – were either omitted or performed by personnel not qualified to do so. Visual inspections – which can be performed with or without magnification and with or without close-tolerance measuring devices – were often performed only after manufacturing was complete, which eliminated the opportunity to review internal surfaces.

124.      Nuflo's failure to perform required NDT means that it has not assured, and could not demonstrate, that the products it supplied to the United States conformed to contract specifications and drawing requirements.  Defendants could and should have been aware of the failure to complete these tests by on-site visits to the Nuflo plants and simple observation that the tests were not performed, or by a request for records validating that the required tests had been met.  They did neither.  The failure to ensure NDT occurred also resulted in nonconforming parts installed in submarines and carriers delivered to the United States.

### 4.      **Unqualified Personnel and Improper Inspections.**

125.      All forms of NDT require training and familiarity with the equipment, means, and methods of the test, and NDT operators are required to be certified.  Typical certification

programs allow certification as Level I, Level II, and Level III test operators, and uncertified personnel are not permitted to perform any NDT operations. Rather than invest the time and resources in properly training employees to be NDT-certified, Nuflo gave unqualified, untrained employees the answers to NDT certification tests.  Thus, when Nuflo did undertake an NDT operation like a visual inspection, the overwhelming majority were performed by fraudulently-certified inspectors.

126.    Nuflo routinely allowed improperly certified, or wholly-uncertified, personnel to perform procedures, tests, and inspections required to complete the manufacture and assembly of parts in conformity with contract and quality requirements.  By way of example, Nuflo permitted Evan Licausi (nephew of owner John Licausi) to perform inspections on parts sold to SFS and EB prior to being certified, allowed Mr. Cintra, a non-certified inspector, to perform penetrant testing, and allowed a trainee named Dale Huggins to perform many penetrant tests without proper supervision.

127.    Nuflo also regularly used inadequate equipment to perform the required testing, thus rendering the testing wholly invalid. For example, Nuflo used uncalibrated gages in its inspection of parts.

128.    Nuflo's use of improperly certified inspectors and uncalibrated equipment would have been readily apparent to Defendants had they conducted their contractually-required oversight by performing an audit of employees signing off on NDTs or by conducting on-site physical examination of Nuflo's equipment.  Nuflo's failure to use certified inspectors or calibrated equipment violates the contractual specifications for products supplied to the United States for use in submarines and carriers, and Defendants failure to oversee these processes violates their contractual obligations under the prime contract with the Navy.

### 5.   Falsification of Records.

129.   Each part supplied to the United States must be accompanied by a documentation package which attests and fully documents that the part has been manufactured, tested, inspected, and approved under the required contractual specifications.  These documents also allow an end user to verify the traceability of a particular part, from acquisition of raw material to final delivery.  This is often referred to as "cradle to grave" traceability. Despite this being a critical component of quality control, Nuflo routinely falsified the documents.

130.   At Nuflo, the Traveler Record is a document that follows the part and ensures that each part of the process is certified to be complete by both the technician performing the action (such as grinding, deburring, welding and/or weld repairs, LP testing, pressure testing, or performing Quality Control) and the Quality Control Representative.  Rather than complete the document throughout the process, Nuflo completed the Traveler Record after the fact, just prior to delivering an end product, by a person other than the actual technicians and inspectors who worked on the part.

131.   Defendants failed to verify the accuracy of the Traveler Record or other traceability documents, despite the ability to do so through on-site inspections or by asking for Traveler Records mid-process to verify that the stages were being completed accurately.  Failure to do so was a knowing abdication of Defendants' oversight responsibilities on a critical aspect of the quality control process.

### B.   DEFENDANTS' FAILURES OF OVERSIGHT IN VIOLATION OF MATERIAL QUALITY ASSURANCE REQUIREMENTS.

132.   Each of these Defendants know, are deliberately ignorant of, or are recklessly indifferent to the fact that Nuflo parts sold or delivered to the United States were not properly manufactured and that Nuflo and SFS failed in myriad ways to utilize and enforce the quality

system requirements which are mandated by all contracts pursuant to which these products are made.

133.   Defendants certify to the United States that products manufactured by Nuflo conform to the contract requirements and quality procedures when they do not.  As prime contractors, Defendants are required to ensure that all parts delivered to the United States be manufactured, tested, and inspected in a quality-controlled environment.  As part of their certifications, Defendants attest that they have performed functions ensuring that quality control requirements flow down to subcontractors.

134.   Defendants did not assert adequate, or sometimes any, oversight and control.

135.   For example, Defendants never conducted a single audit of repair welding occurring at Nuflo in the more than a dozen years leading up to the Government's disclosure of its investigation, in 2015, of Relator's allegations.

136.   There is no evidence that either Defendant met with or spoke with either of the welders employed by Nuflo during the 13-year period from 2002 to 2015.

137.   Indeed, the representative that EB sent on-site to Nuflo on a periodic basis did not perform diligent on-site inspections; rather, that representative, Frank Chiaradio, mainly spent his time on-site in the main office with Nuflo President John Licausi, with whom he maintained a close personal relationship. By information and belief, Mr. Chiaradio stayed at Mr. Licausi's home on more than one occasion.

138.   Defendants did not ensure its oversight included objective, independent, and substantive review.  Indeed, the bulk of the audits performed by Defendants were "desk audits" where checklists were remotely completed based on the existence of completed paperwork as opposed to actual independent evaluation of the processes in place at Nuflo and SFS.

139.     Defendants accepted Nuflo product without effective audit and inspection of either supplier's quality and welding operations, and that failure permitted nonconforming products to be installed into nuclear submarines at great cost to the United States.

**1.     Defendants' Use of a Supplier Delegated Inspection Program Caused Massive Failures in Quality Control.**

140.     As described in Section IV.D, EB and NNS were Defendants in a high-profile *qui tam* matter, pending between 2001 and 2006, which involved markedly similar lack of quality control and falsified documents hiding weld repair and lack of proper testing and inspection relating to a valve supplier for Defendants for nuclear submarines.  Based on that experience and the straightforward obligations set forth in its prime contracts with the United States, Defendants had full knowledge that they were required to exert quality control over their suppliers to the degree necessary to ensure conforming Level 1 and SUBSAFE components.

141.     Notwithstanding this knowledge, Defendants utterly failed to perform diligent oversight of Nuflo or SFS. Instead, in the same time frame that it was attempting to resolve allegations of an out-of-control supplier who performed unauthorized and undocumented weld repair, Defendants determined that Nuflo should be part of program whereby Defendants significantly decreased their oversight and delegated their inspection authority to Nuflo officers and employees.

142.     Specifically, in 2002 and 2005, respectively, NNS and EB selected Nuflo as a supplier under its Qualified Supplier Delegated Inspection Program (also called "SDIP"), which permits Nuflo to act on behalf of EB regarding inspection of hardware and review of deliverable documentation. Under that program, specific Nuflo personnel are identified as Supplier Delegated Inspectors and Supplier Delegated Analysts to act in lieu of EB Source Inspection and to provide "necessary assurance that complete and fully satisfactory material is supplied to

-36-

Electric Boat." These designees include Nuflo personnel Chris Moore, Steven Cefalu, Ryan Licausi, John Licausi and Burt Colbert, among others.

143.    NNS and EB accepted SFS into the SDIP program in 2008 and 2012, respectively. SFS was first qualified by NNS after Nuflo was suspended from its program in 2007 because of concerns over repeated dimensional issues. (Nuflo, however, continued as an SDIP supplier for EB). SFS was then accepted by NNS into the SDIP program strictly to distribute Nuflo product, even though NNS knew that SFS, which shared common ownership with Nuflo shareholders, was a warehouse located near NNS's facility with no machining capability nor developed quality system. Nuflo was not re-accepted into SDIP by NNS until 2011.

144.    To qualify a supplier under this Program, Defendants assert that they will conduct initial and periodic on-site Quality Assurance System Survey/Evaluation to "assure compliance with contract and policy requirements." In addition, Defendants represent that they will perform on-site evaluations to ensure the program is being adequately maintained, and that an annual compliance audit will be performed. Further, the SDIP requires that the supplier must maintain a quality rating of 95% or greater to be and remain eligible for the program. The SDIP also provides that the on-site evaluation and compliance audit "will verify compliance by review of objective quality evidence contained in documentation, observation of actual practices, inspection of material, software, etc."

145.    Defendants' standards to qualify and keep vendors in the SDIP program were ineffective in that they were not rigorous enough to detect deficiencies in Nuflo's operation, notwithstanding that Nuflo's quality failures have been ongoing and consistent since the beginning of the program. Nuflo lacks an internal audit department, lacks appropriate inspection

measurement devices, and lacks well-developed quality documentation.  SFS is a similarly small company with no independent manufacturing capability and minor testing functions.  Indeed, there was no meaningful distinction between Nuflo and SFS for quality control purposes.

146.    Moreover, Defendants' criteria for identifying their delegated inspectors was deficient such that many of the SDIP designated personnel are not qualified to perform inspections. Nuflo is a closely-held company with approximately 40 employees and many of the management personnel are related to one another. SFS has shared ownership to Nuflo. Notwithstanding the inherent conflict of interest of the President of a company performing quality analysis on its own products, EB approved John Licausi as an SDI designee.  EB also approved his son Ryan Licausi, who had the same inherent conflicts and no experience, much less certification, as an inspector.

147.    Regardless, once Defendants qualified Nuflo and SFS for the SDIP, they did not perform the audit and review which would be consistent with their obligations under their government contracts or under their self-design within the SDIP program. And their annual compliance audits, not always performed timely, did not involve actual inspection and observation of Nuflo processes such as welding.

148.    Defendants certified their compliance with ISO quality standards, which define an audit as a "systematic, independent and documented process for obtaining audit evidence [records, statements of fact or other information which are relevant and verifiable] and evaluating it objectively to determine the extent to which the audit criteria [set of policies, procedures or requirements] are fulfilled."

149.    Defendants did not perform audits of its suppliers which conformed to this definition; rather its SDIP audits were perfunctory, using a checklist approach to ensure that

certain paperwork existed. As described, its periodic on-site inspector was equally perfunctory, and abdicated, as did the Defendants, oversight and inspection duties to the suppliers themselves.

150.     During the period Nuflo and SFS personnel were authorized by Defendants to perform certain inspections on behalf of Defendants, Defendants are bound by the actions of each of those delegated inspectors. By utilizing the SDIP program instead of completing its own diligent oversight, Defendants made the Nuflo and SFS personnel their agents for the purpose of these inspections and the knowledge of these personnel are imputed to them. Defendants' own policies provide that SDI personnel represent Defendants, not the supplier, during performance of the supplier delegated inspection program.

151.     For example, when Nuflo personnel completed Supplier Delegate Inspection Reports (SDIRs), they were required to accompany the shipment of parts and which included the following note above the signature line:

> Note: The person signing for an action verifies and certifies that based on personal observation or positive evidence the action has actually been performed in accordance with specified procedures, specifications, drawings.

152.     All such certifications were false. Each of the various delegated inspectors -- John Licausi, Chris Moore, Steven Cefalu, Ryan Licausi, and Burt Colbert – knew that the action was not in fact performed in accordance with specified procedures, specifications, and drawings. In so doing, these individuals, acting as agents of Defendants, made false statements and caused nonconforming parts to be delivered to the United States.

153.     Thus, Defendants accept and sell Nuflo parts to the United States certified for conformance to material government contract requirements despite actual knowledge, deliberate ignorance, and/or reckless disregard of the fact that their SDIP qualifying practices were ineffective, and their SDIP designees were unqualified and incapable of assuring supplier

compliance with quality requirements.

      **2.**      **Defendants Deliberately and Recklessly Ignored Repeated Warning Signs Regarding Quality Failures of Nuflo and SFS.**

154.    In addition, Defendants EB and NNS ignored repeated warning signs regarding the existence of nonconforming fittings and regarding the failure of Nuflo's and SFS's quality control.

155.    A critical warning sign was Nuflo and SFS's consistent struggle to meet delivery and completion dates. Repeated production delay is a sentinel indicator of fraud during the performance of a contract.[6] The issue was noted by both NNS management, who pressured its analysts to figure out the cause of the delays at SFS and Nuflo, and by the Buyers who oversaw the subcontractor relationships. Recognized by EB as one of the worst offenders in terms of contract delivery delinquencies, SFS was routinely late with large portions of its order, at times delayed on almost 70% of its open orders. SFS and Nuflo's common refrain was to blame its raw materials providers for the delays, primarily laying blame at the feet of KME America and Bourdon while consistently denying any manufacturing capacity issues.

156.    Yet, despite delays so persistent that they threatened the overall delivery of the submarines to the United States, Defendants never performed – or demanded that SFS or Nuflo perform – an audit on the root cause of the failure to make deliveries within the prescribed timelines. Notably, Defendants did not independently investigate or even inquire whether the delays were because SFS and Nuflo had to reweld and repair parts several times over.

157.    Defendants' contractual obligations required them to exert appropriate quality

---

[6] *E.g.,* Air Force Materiel Command Procurement Fraud Indicators Handbook, Air Force Materiel Command Law Office, Acquisition Integrity Division, July 2008, Page 39 (https://www.acq.osd.mil/dpap/ccap/cc/jcchb/Files/Topical/Ethics/guides/AFMC%20Procurement%20Fraud%20Indicator%20Handbook.pdf).

Case 3:19-cv-01290-TJC-MCR   Document 52   Filed 07/31/20   Page 42 of 79 PageID 275


control over these suppliers, and required them to proactively ensure that conforming materials were being supplied. Defendants' contractual obligations are not triggered by notice of specific failures in their supplier system, but exist as separate and independent obligations derived from their prime contracts with the United States.

158.     Notwithstanding this, there *were* repeated significant events which should have triggered Defendants to exert scrutiny over Nuflo and to ensure that their suppliers were meeting the exacting standards required for SUBSAFE military equipment.

159.     Representative examples of such red flags are described below.

160.     In June 2006, NNS's predecessor entity, NGSS, took issue with Nuflo over late delivery on more than 20 purchase orders, including purchase order number CDB-35435-05 for 55 fittings, part number 4730-DA0-225017, which are 10-inch 90 degree elbows. Mr. Skobic's contemporaneous written journal records show that, on August 21, 2006, he weld-repaired a quantity of four 10-inch 90 degree elbows, and shortly thereafter, elbow fittings were then invoiced by Nuflo to NGSS on Invoice 10713. On September 19, 2006, NGSS issued a nonconformance report and a request to return and replace material, for purchase order CDB-35435-05, based on several defects, including tooling marks and pin holes in the weld seam (suggesting a weld repair), and the fact that the inside of the pipe was ground below minimum wall thickness.  Notwithstanding evidence of grinding and potential undocumented repair, NNS did not require root cause analysis or corrective action regarding the nonconformance report.

161.     In March 2007, EB discovered weld repairs on two Nuflo elbows during installation on a submarine.  Instead of issuing a Supplier Corrective Action Report for undocumented repairs, EB concluded the event was not a significant concern. EB did not undertake any root cause analysis as to the initial deficiency nor why its vendor was performing

-41-

undocumented weld repairs.

162.    In April 2007, the NNS Manager of Supplier Quality advised Nuflo that effective April 30, 2007 Nuflo was suspended from SDI activities on behalf of NNS due to quality issues. The NNS suspension notice was provided to EB's Manager of Supplier Quality, Nancy Beckwith.  Notwithstanding this suspension, neither Defendant conducted a focused audit of Nuflo's weld processes or quality systems.  Rather, during the time of suspension, NNS transferred source inspection of Nuflo material to SFS, a distributor 50% owned by shareholders of Nuflo. Despite EB and NNS's Teaming Agreement and its knowledge of Nuflo's quality issues, EB did not suspend Nuflo when NNS did nor did it increase its oversight, inspection or audit functions.

163.    In February 2008, an EB Buyer alerted Nuflo that EB had rejected 24 pieces which had been delivered with the same part number as 44 previously-delivered pieces. In response to questions about a marking problem, Nuflo President Licausi responded that the previous parts should have been marked "2633" not "2621" (for part number 263322801-214A) and there was no way to know how many jobs were missed by the mismarking.  Notwithstanding that these involved Level 1 parts, this did not trigger a root cause analysis on the mismarking.

164.    In July 2008, EB discovered more suspected weld repairs to a six-inch Nuflo elbow that was being installed on a submarine.  EB weld repaired the defects and continued construction.  EB did not investigate the existence of undocumented weld repair at Nuflo, did not conduct root cause analysis, nor did it follow-up with Nuflo on their welding/weld repair processes during the next on-site audits, inspections or visits.

165.    In February 2009, EB personnel were concerned that repairing tooling impressions on Nuflo Elbow Part Number 218002154, a Level 1 five-inch 90-degree elbow

fitting might result in an underwall condition.  The defect resulted in the EB Supervisor, Materials Management distributing an email to other senior EB officials, including the Quality Director and EB's Senior Buyer for Nuflo products reporting on the part as well as stating that the pipe shop mechanics (EB personnel) do not like working with Nuflo products because they feel there is always something that is wrong with the part.  The EB Senior Buyer forwarded the correspondence to the Nuflo President.  Notwithstanding these observations about Nuflo parts, EB did not perform any additional inspections of Nuflo, and maintained its status in the SDIP program.  Indeed, an SDIP audit in November 2009 did not include any increased scrutiny.

166.    In April 2009, NNS issued a quality notification to SFS, numbered 200163109, for minimum wall violations on five (5) 2 inch elbows. As part of a preventative action, Nuflo agreed to purchase UT thickness equipment and SFS agreed to meet with NNS representatives to discuss the equipment and procedures. The fact that this equipment was neither purchased or utilized by either supplier prior to 2009 was not questioned or investigated. Nor did the violations trigger further audit. Rather, in October and November 2009, respectively, NNS performed a routine SDIP audit at SFS and EB performed a routine SDIP audit at Nuflo, and neither involved heightened scrutiny or in changes to the lack of oversight by Defendants.

167.    On May 29, 2009, EB issued Supplier Corrective Action Report 052909FSC-1 to Nuflo advising that part numbers SVT252-001-1 and SVT252-001-2 supplied on Purchase Order Number PPU206-060 had been received at the shipyard and determined to violate the minimum wall thickness invoked by EB – just one month after the previous wall-thickness issues.  Nuflo's proposed corrective action was to submit a Vendor Information Request to weld repair the elbows that are under the low limit on wall thickness. In that same time frame, the Nuflo Quality manager sent the EB Supplier Quality representative a sketch for a weld repair of an elbow for

EB Purchase Order "GPR121-140 Item 23, 192." Notwithstanding EB's awareness that this weld repair sketch was historical (from a prior company of Mr. Licausi's named Nucraloy), EB did not audit Nuflo's weld repair process at that time or any time before the Government's investigation into this matter.

168.    On February 2, 2011, an NNS requested an update from Nuflo regarding Purchase Order Number 4500343805/04 for sixteen "tees" – a specific type of pipe fitting – because Nuflo's delay had been flagged as potentially holding up production and delivery of the submarine. Although Nuflo promised that the items would be shipped no later than Feb. 14, it later advised NNS that the tees had been rejected in final inspection and would need to be reworked. Nuflo did not provide any reason for the rejection or the required rework, and NNS did not demand such information nor require any additional corrective measures or oversight as a result of the failure.

169.    On March 27, 2011, NSS issued a Corrective and Preventative Action Request ("CPAR") noting that SFS has shown increased quality rejection ("QN") activity and was required to address 11 specific QNs with root cause/corrective actions. Eight out of the 11 QNs related to traceability. An SFS Quality Assurance Manager responded on June 24, 2011, and a mere *three days* later, an NNS Senior Commodity Engineer wrote that the responses were reviewed and accepted, and validation of the completed actions would be accomplished via follow-ups audits and visits. NNS conducted a two-day SDIP audit at Nuflo, from June 29-June 30, 2011, which it declared to be "Sat[isfactory] with Observations." Neither the CPAR nor the audit resulted in any subsequent heightened scrutiny by NNS or EB, nor in changes to the lack of oversight by Defendants.

170.    On August 24, 2012, NNS notified SFS that NNS had received four flanges from

SFS that appeared to be mismarked and contained different parts in different sizes. Despite knowing that the parts had a quality error, an NNS representative coordinated efforts with the SFS representative to replace the mismarked parts rather than log another Quality Notification. As a result of their coordinated efforts, an SFS employee picked up the mismarked products, remarked them according to specifications, and redelivered them to NNS. Although SFS had addressed a series of traceability issues just one year prior and supposedly corrected the issues, NNS did not take any additional steps or corrective actions, other than to help SFS escape additional QNs by allowing it to pick up and remark the products.

171.     EB also helped SFS and Nuflo avoid responsibility for their nonconforming practices. On Aug. 30, 2012, EB found that Level 1 flanges had been sent directly to EB by Nuflo without inspection, rather than sending the part to SFS for EB source inspection. Although shipping a part with a missing source inspection is a major failure with potentially serious consequences, EB did not take any additional steps or corrective action to assure that Nuflo's error did not recur. Nor did it document the shipment of an uninspected product as a QN. Rather, EB representatives hunted down the part so they could perform a receipt inspection internally, thus keeping the issue hidden and undocumented.

172.     On Sept. 17, 2013, the EB Supervisor of Quality, Supplier Quality Division and the EB Supplier Quality Auditor/Engineer responsible for Nuflo met with Nuflo president John Licausi at the EB's offices regarding serious issues that EB's source inspectors were having at SFS, including heat number traceability, furnace charts, heat-treating certifications and the proper completion of required documents. Following the meeting, EB and Nuflo began to maintain a log which would document all future requests or issues that arose from EB source inspectors. EB did not undertake any on-site audits, inspections or root cause analysis to

determine the cause of the serious deficiencies at SFS that its source inspectors were noting.

173.    On Sept. 30, 2013, SFS failed to meet a target shipping date for a pair of eight-inch elbows that had been manufactured at Nuflo and sold to NNS through SFS pursuant to NNS Purchase Order Number 4500400019/001 and SFS Purchase Order Number 25677 and were already far past due. These elbows had been shipped to NNS twice and failed at receipt inspection both times, prompting QN 200253171 to be issued on Dec. 5, 2012 detailing that the elbows were received with counterbore inside dimensions out of tolerance. By October 2013, SFS was still having trouble with the rework and had not delivered the elbows. The repeated manufacture failures resulted in a shipment delay of approximately one year from the time of order.

174.    On Feb. 3, 2014, NNS issued QN 200330406 related to SFS's mismarking of fifteen 10 inch elbows (part number 15380747) that had been manufactured at Nuflo and sold to NNS through SFS pursuant to NNS Purchase Order Number 4500446059/2 and SFS Purchase Order Number 27960. The QN required determination of the root cause, corrective action and preventative action. The parts were remarked and resubmitted to NNS, but SFS did not submit and NNS did not require a root cause analysis or a corrective or preventative action plan related to this QN.

175.    In April 24, 2014, Nuflo was delayed in sending a partial shipment associated with Purchase Order Number 4500462789 because some of the products failed the non-destructive testing ("NDT") inspection.  Neither at the time of the shipping delay, nor at any time thereafter did NNS inquire as to what issues arose with the products, the cause of the issues, or what needed to be done to correct the issues and prevent the same from occurring in the future.

176.    In or about November, 2014, NNS processed a 10-inch elbow manufactured by

Nuflo and determined that it did not meet minimum wall thickness requirements. The product was purchased pursuant to NNS Purchase Order Number 4300150499 and SFS Purchase Order Number 23762. NNS independently determined that the elbow could be used for its intended application, so placed it on a submarine even though it was below the required standards.

177. In or about March 2015, Quonsett Point shipyard employees noted that eight Level 1 Nuflo parts made it through manufacture inspection and source inspection to arrive on the shipyard mismarked. EB issued an Engineering Report which rejected the parts. Rather than create a QN, an EB Buyer sought approval from SFS to allow Quonsett Point employees to simply remove and remark the parts with the accurate MIL spec. SFS granted the permission and the parts were remarked.

178. Despite years of mismarking and traceability issues, now with mismarked parts making it as far as the shipyard, EB took no corrective actions with SFS nor Nuflo. Rather, EB coordinated efforts with SFS and Nuflo to quickly cover the issue with no further follow-up or analysis as to why they continued to deliver mismarked parts, even four years after the 2011 CPAR noting virtually identical issues.

179. Throughout the many years Defendants procured fittings from Nuflo or SFS, they repeatedly saw red flags which did or should have made them aware of significant quality failures which neither Defendant adequately investigated or corrected. Defendants' systematic failure to ensure quality control at these suppliers was in knowing disregard of its obligations to the United States.

**C. DEFENDANTS' CONDUCT WAS KNOWING AND RESULTED IN FALSE CLAIMS TO THE UNITED STATES.**

180. Defendants are liable for knowingly submitting or causing the submission of false claims to the United States.

181.    Defendants knew that the fittings they acquired from Nuflo and SFS were being installed in nuclear submarines and other vessels under its prime contracts with the United States.

182.    Defendants knew that a significant percentage of these fittings were Level 1 and were installed in nuclear areas of the submarines.

183.    Defendants were on notice of the demanding quality requirements of their contracts, including that they were required to proactively ensure the conformity of parts procured from its suppliers.

184.    Defendants knew that they were paid to discharge the sole, ultimate responsibility to ensure that the products they procured were conforming to the quality requirements and specifications of their contracts.

185.    Defendants knew these provisions were profoundly important to the Navy, and were material to the United States.  The lack of conformance to the quality specifications of the contract would affect the United States' payment and procurement decisions under these contracts.

186.    As Vice Admiral Paul E. Sullivan (USN Ret.) testified to Congress in 2003, the existence of quality control, including through its SUBSAFE program, is critical to ensuring the safety of naval vessels and their crew.  Admiral Sullivan was, at the time, the Deputy Commander for Ship Design and Integration, Naval Sea Systems Command.

187.    EB's own Supplier Training recognizes that "[t]he lives of the US Navy sailors depend upon compliance to the strict guidelines of the Submarine Safety (SUBSAFE) Program."

188.    Defendants were on notice that its oversight was inadequate to detect this particular conduct by its suppliers, having been defendants in a False Claims Act suit involving

very similar allegations regarding falsified weld repairs and falsified testing of components for nuclear submarines. *United States ex rel. Tina Gonter, et al. v. General Dynamics, Marine Systems Division, Electric Boat*, et al.. Civil Action No. 4:01CV634 (N.D. Ohio). That lawsuit, which resulted in two convictions and gained the attention of the highest echelons of the Navy, began in 2001 and resolved in 2006.

189.    In the midst of that suit, Defendants started contracting with Nuflo, and did not once do an on-site audit of weld repair.  Indeed, they were purportedly unaware that one of the full-time welders did not speak English and that the company did not keep contemporaneous documentation of any weld repair, notwithstanding evidence that weld repair was occurring (see *supra* Section V.A.1).

190.    Very shortly after the *Hunt Valve* matter resolved, Defendants made Nuflo one of very few shipbuilder contractors with express delegation of inspection authority by Electric Boat and NNS. Defendants delegated their authority to Nuflo, and SFS, to inspect its own product and certify that product acting on behalf of the shipbuilders.  Therefore, Nuflo's and SFS's knowledge of false certification as SDIP inspectors is imputed to the shipbuilders.

191.    Defendants also deliberately and/or recklessly ignored warning sign after another that these suppliers were not exerting the quality control required by Defendants' contracts.

192.    The Navy expects exacting adherence to carefully developed requirements for end-products, and all its components, procured through contractors like Defendants.  The Navy pays a significant premium for this adherence, and did not get what it bargained for.

### 1.    The United States is the Customer for Defendants' Delivery of Nuclear Submarines Pursuant to Prime Contracts and Subcontracts.

193.    Defendants' primary customer is the United States Department of Defense and their only customer for nuclear-powered submarines is the United States Navy. Defendants

concede that the majority of their revenues relate to the provision of nuclear-powered vessels to the United States.

194.    As previously identified, the specific contracts at issue for the delivery of submarines are: (1) N00024-96-C-2100 representing Block I; (2) N00024-03-C-2101 representing Block II; (3) N00024-09-C-2104/3 representing Block III; (4) N00024-12-C-2115 representing Block IV; and (5) N00024-17-C-2100 representing Block V. The specific contracts at issue for delivery of aircraft carriers are: N00024-98-C-2104; N00024-08-C-2110; and N00024-15-C-2114.

195.    Defendants contracted with Nuflo and SFS to supply piping components for Defendants to install on these vessels, and concedes the same.  Nuflo settled allegations as a former defendant in this matter relating to nonconforming and defective fittings it caused to be delivered to the United States directly and through Defendants.

### 2.    Nonconforming Fittings at Issue Were Installed on Nuclear Submarines.

196.    As a result of the Government's investigation of the original complaint in this matter, nonconforming fittings were identified on delivered nuclear submarines.

197.    Specifically, in responding to the Government's inquiries during the seal of this matter, Defendants identified that many fittings supplied by Nuflo and installed in submarines were deficient due to (a) incorrect test documentation, (b) incorrect testing and/or (c) unauthorized and undocumented weld repairs performed on these fittings.  The unauthorized, undocumented, and/or unqualified weld repairs were both to build up the wall thickness of its parts, and to repair splits, galling or cracks that occurred during the parts' forming process.

198.     Certain of these fittings were installed on three of the newest Virginia class submarines being delivered to the United States, which, as a result, were restricted from operations while the Navy evaluated next steps.

199.     Specifically, in a public release on August 18, 2015, NAVSEA stated that "[t]he Navy has determined that fittings provided by [Nuflo] are installed on ships throughout the fleet," and that "based on information pertaining specifically to the fittings installed on these ships," three of the newest Virginia-class submarines would remain out of service while the investigation of "unauthorized and undocumented weld repairs" continued.

200.     At least six nonconforming parts were found to be installed on the USS North Dakota (SSN-784), three on the USS John Warner (SSN-785), and one on the USS Minnesota (SSN-783).  It has been reported in the press that the pipes in question involved 10 inch elbows, and included evidence of improper welding.

201.     A Congressional Report from April 14, 2016 stated that "[i]n early 2015 engineers on a brand-new submarine [the Minnesota] made a troubling find:  A pipe joint near the innermost chamber of its nuclear-powered engine had shown signs of tampering."   The report further stated that "[t]he same shoddy elbow joints were installed aboard attack subs North Dakota and John Warner, forcing the Navy to spend millions of dollars and many more months to repair them."

202.     The April 14, 2016 Congressional Report stated that "the flawed pipe fittings may extend well beyond the three identified attack submarines," and that NAVSEA had "sent inspectors across the fleet to test Nuflo-made fittings on other ships" but "the full scope of the problem remains unclear."

203.    On December 20, 2019, the defective Nuflo parts were still being identified to Congress as an issue with "operational and cost implications" for the Virginia-class submarine program.

204.    The repairs related to EB and NNS's installation of these nonconforming parts was time-consuming and expensive, because the nuclear reactor infrastructure on these submarines was never meant to be dismantled during the life of the submarine.

205.    EB and NNS's installation of these nonconforming parts has therefore resulted in a years-long delay of the United States' submarines, each of which is valued at $2.7 billion or more.

### 3.    Additional Representative Examples of Specific Nonconforming Fittings.

206.    While working for Nuflo, beginning in 2005, Mr. Skobic was personally instructed directed to perform unauthorized welds on parts for purchase orders from NNS and EB, as identified specifically in Section V.A.1. above.

207.    Between May 2006 and October 2013, Mr. Skobic kept a detailed personal journal which included notes of the unauthorized weld repairs that he was directed to performed or otherwise observed at Nuflo.  The journal documents about 3,929 weld repairs on Nuflo parts. Persons who instructed Mr. Skobic to perform the unauthorized weld repairs included Nuflo president and part-owner John Licausi; his son, Production Manager Ryan Licausi; and Quality Managers Chris Moore and Steve Cefalu, who were each designated by EB and NNS as delegated inspectors on the shipbuilders' behalf.

208.    Indeed, Mr. Skobic often also recorded the specific Nuflo personnel who brought him parts for weld repairs, or brought him parts on the direction of John Licausi or one of the other managers.  Mr. Skobic's journal reflects at least 190 specific instances on distinct dates of

Defendants' delegated inspectors (John and Ryan Licausi, Chris Moore or Steve Cefalu) directing him to perform weld repairs between the time frames July 2006 through October 2013.

209.    The following reflects additional representative examples of nonconforming fittings procured by Defendants and provided to the United States in violation of material quality assurance requirements.

210.    On May 11, 2006, Mr. Skobic noted in his journal that Nuflo management brought him a six-inch flange to weld, but to make it look like it was not welded and not forged. Mr. Skobic that this was "very dangerous" because the issues with the part "could get worse if it's put on ship or submarine."

211.    In 2009, Mr. Skobic recorded at least 413 weld repairs on Nuflo parts, including 193 elbows, 122 flanges, 15 laterals, 27 reducers, two spheres, two stub ends, 51 tees, and one assembly.

212.    On June 29, 2009, Mr. Skobic noted in his journal that he performed a clad weld repair to cover cracks in some six-inch 45° elbows for EB (Job No. 23894-01), on an area that was 4¼-inches by 1¾-inches large.  In the next day's journal entry, Mr. Skobic noted that he continued welding a third six-inch 45° elbow that exhibited similar cracks. Nuflo's records indicate that these three elbows (which carried the Heat No. NG1242-2) were packaged and shipped to Electric Boat (Purchase Order Number GPU086-077, Supp 009, Item 0012 (Part Number 211046847) on October 7, 2009, with documentation that disclosed the repairs on at least one of the elbows.

213.    A drawing included in the certification package identifies the order as "Level 1." The drawing provides the "approximate location of weld repair < .030" thick," but does not record the area size.  This shipment was also marked as "Supplier Delegated Inspection." The

traveler record does not identify any operations associated with weld repair.  A

"Welding/Brazing Tracking Form" purporting to have been prepared by Nuflo's Quality

Manager and dated October 5, 2009, records welding on the three parts (including specific

metrics such as preheat temperatures and PT inspection procedures) on October 5, 2009, which is

not the date Mr. Skobic performed the weld repairs.  Mr. Skobic never saw the welding form or

the drawing and other than one or two occasions during his entire career at Nuflo never saw a

weld repair drawing. The drawing and tracking form sent to EB omitted some of the key

requirements of NAVSEA Technical Publication S9074-AR-GIB-010A/278, Section 10.3.5,

specifically a description of defects repaired, the location, length, width and depth of excavation.

Providing an "approximate location" and stating the weld repair was "<.030 thick" should have

resulted in a response by EB for all of the required data and/or formal rejection of the parts.

214.     On July 27, 2009, Mr. Skobic noted in his journal that he had started repairs on

SR 10-inch 90° elbows for EB Job No. 24147-01. He weld-repaired on these elbows over the

next week, repairing a total of nine elbows. At least one of these elbows underwent an additional

weld repair on September 24, 2009.  Nuflo certified to Electric Boat these elbows (Purchase

Order GPU086-077 SUPP 009, Part Number 211053219) were in conformance with all

applicable specifications, yet also disclosed the weld repairs on at least some of the elbows.  The

Nuflo job number recorded by Mr. Skobic in his journal on July 27, 2009 (24147-01) is recorded

on a drawing included in the certification records provided by NNS.  The drawing also includes a

handwritten "Lev I," indicating the part was designated "Level 1."

215.     A Welding/Brazing Tracking Form prepared by Nuflo's Quality manager, dated

October 5, 2009, records weld repair on one of the elbows, referencing item number 69. The

form records the repair occurred on October 5, 2009 by Mr. Skobic and was recorded in Nuflo's

welding/brazing log. The weld repair sketch records the location (no dimensional details) of weld repair in two areas of the elbow and states the weld repair was ">.030 thick."

216. A second welding tracking form dated September 30, 2009 records that four elbows referenced to item number 69 were weld repaired by Mr. Skobic on September 9, 2009 The weld repair sketch depicts one elbow with a location (no dimensional details) and statement, "approximate location of weld repair <.030" thick."

217. A liquid penetrant inspection report dated September 230, 2009 and signed by Nuflo's Quality Manager certifies that four parts were accepted, none were rejected, and none were reworked. A liquid penetrant inspection report for four additional parts (with different serial numbers), dated October 2, 2009 and signed by Nuflo Quality Manager Chris Moore, certifies that four parts were accepted, none were rejected, and none were reworked. A liquid penetrant inspection report for one additional part (with a different serial number) dated October 5, 2009 and signed by Nuflo's Quality manager certifies that one part was accepted, none were rejected and none was reworked. The traveler record records that a quantity of nine pieces of part number 211053219 (10-inch elbows) had completed final inspection by September 30, 2009. There are no entries for weld repair on the traveler record.

218. In summary, the actual dates of weld repair as recorded in Mr. Skobic's records, as well as the quantity of elbows repaired, do not correspond. Notwithstanding these discrepancies which appear on the documentation provided to defendants, there is no evidence that the certification package raised any questions by Electric Boat or NNS with respect to specific locations of weld-repaired items or the serial numbers of the items, and that none of the PT inspection reports or traveler records indicated parts were either rejected or reworked. There is no evidence that any questions as to root cause or why the weld repairs were required were

raised, nor that any information regarding those issues was requested or provided.  Had either shipbuilder analyzed these documents and raised necessary questions with Nuflo, corrective action would have been necessary and appropriate.

219.    On September 17, 2009, Mr. Skobic recorded weld repair on three 10-inch 45° elbows in an area next to the bevel for EB Job No. 23891-01.  Electric Boat's documents from Nuflo indicate that these elbows were Level 1 parts purchased via Purchase Order No. GPU086-077, Item 11, Part Number 15-07-2630.  Nuflo's Job number 23891-01 is marked on multiple documents in this set of records and corresponds with the job number recorded in Mr. Skobic's journal entry.  The documents reflect that inspection and acceptance of these parts had been delegated to Nuflo by Electric Boat.  The following is an extract of the delegation statement:

> Nuflo has been authorized to inspect and accept material on behalf of EB Source Insp.  The supplier will stamp the packing list inspected and accepted on behalf of Electric Boat.  Delegated inspectors for software and hardware review are Chris Moore, Steve Cefalu, Burt Colbert, John Licausi.  Ryan Licausi is approved for hardware inspection only.  Frank S. Chiaradio 12/2/09.

A liquid penetrant inspection report states that two 10" elbows were tested on June 26, 2009 and accepted by the Nuflo Level II NDT examiner.  The report states that two pieces were accepted; none was rejected; and none was reworked.

220.    On September 28, 2009, Mr. Skobic began weld repairing eight-inch SR elbows for Electric Boat Job No. 23700-01.  Mr. Skobic continued this work over the next three days, clad welding and/or repairing cracks on at least four of these elbows.  At least two of these elbows were again repaired between October 9 and October 12, 2009, when Mr. Skobic noted that he weld-repaired the wall around the bevel (where it was ground under) for EB Job No. 23700-01.

221.    Nuflo's documents indicate that these elbows were Level I parts and procured as

part of Purchase Order No. GPU086-077, Supps. 009 and 012, and that Nuflo's weld repairs on at least some of these elbows were disclosed to Electric Boat. NNS records indicate that Nuflo certified to Electric Boat that these eight-inch elbows (Purchase Order GPU086-077 SUPP 012, Part Number 211053219) were in conformance with all applicable specifications, yet also disclosed the weld repairs on at least two dates involving two elbows on each date, without required documentation.

222.    The item number associated with each weld repair date was identified as "064;" however, there are no records identifying unique elbow serial numbers so it is unknown if four elbows were repaired, or two elbows were repaired twice. The Nuflo job number (23700-01) recorded by Mr. Skobic in his journal on September 28, 2009 and October 12, 2009 is recorded on multiple records in this package including a Welding/Brazing Tracking form dated October 12, 2009. This form states repair on two elbows was performed on that date, but there do not appear to be any records regarding the repair process that Mr. Skobic recorded starting on September 28, 2009. The weld repair sketch records the location (with no dimensional details) of weld repair in one area of the elbow, and states the "approximate location of weld repair < .030" thick." A second welding tracking form dated 10/9/2009 records that repairs on two elbows were performed. The weld repair sketch depicts one elbow with a location (no dimensional details) and statement, "approximate location of weld repair < .030" thick."

223.    A liquid penetrant inspection report, dated October 12, 2009, asserts acceptance by Nuflo's Level II NDT examiner states certifies that two parts were accepted; none were rejected; and none were reworked. A second liquid penetrant inspection report dated October 9, 2009 asserting acceptance by Nuflo's Level II NDT examiner states certifies that two parts were accepted; none were rejected and none were reworked. The traveler record records that 18, part

-57-

number 218002158 (eight-inch elbows) had completed final inspection by September 21, 2009. There are no entries for weld repair on the traveler record.

224.     In summary, neither the actual dates of weld repair as recorded in Mr. Skobic's records nor the quantity of elbows repaired match up.  Nonetheless, there is no evidence that the certification package raised any questions by Electric Boat or NNS in regards to specific locations/serial numbers of weld repaired items.  There is no evidence that any questions as to root cause or why the weld repairs were required were raised.

225.     On October 6, 2009, Mr. Skobic noted in his journal that he weld-repaired a 5x4-inch concentric reducer on the 5-inch side half way around the bevel, for EB Job No. 26661-10. Electric Boat's records indicate that these were Level 1 parts (Part Number 218025844/Concentric Reducers) ordered via Purchase Order No. RPV116-065, and that the inspection and acceptance of these parts had been delegated by Electric Boat to Nuflo.  The Nuflo job number recorded in Mr. Skobic's journal is found on multiple records provided by Electric Boat including a liquid penetrant inspection report dated June 16, 2010 which reported that four parts were accepted and 0 parts were rejected or reworked.

226.     On January 12, 2010, Mr. Skobic noted in his journal that he had performed weld repairs on 2½-inch extra-heavy-wall Level 1 elbows for SFS Job No. 25160.  He again repaired the elbows from this job on January 14 and January 15, when he noted that he was clad welding the heels of seven pieces.  Records link the SFS job number (25160) recorded in Mr. Skobic's journal to SFS purchase order number 20816, Part number 211069728, 2½" Level 1 elbows.

227.     As SFS was a source-delegated inspector (SDI) and distributor of Nuflo parts to Electric Boat and NNS, Relator alleges on information and belief that either Electric Boat or NNS issued a purchase order to SFS for the parts. A print identifies the SFS job number as

25160-0 and records there were nine pieces assigned with three pieces designated for stock on or about February 9, 2010.  A Nuflo Welding/Brazing Tracking Form records that a quantity of six parts were weld repaired on February 8, 2010, and that documentation was put in the weld log.

228.    A weld sketch depicts one elbow with a location of weld repair (no dimensions) marked and a statement, "Approximate location of weld repair < .060 thick."  The traveler record does not include any information regarding the weld repair process and reflects that "PT Inspection, Final Inspection and Shipping" of six parts occurred on February 8, 2010.  A liquid penetrant inspection report dated 2/8/2010 reports acceptance of six pieces by Nuflo's Level II NDT inspector with no rejections and no rework.

229.    In summary, the actual dates of weld repair as recorded in Mr. Skobic's records do not correspond with records prepared and submitted by Nuflo and/or SFS.  There is no evidence that the certification package raised any questions by Electric Boat or NNS in regards to specific locations/serial numbers of weld repaired items.  There is no evidence that any questions as to root cause or why the weld repairs were required were raised.

230.    On March 29, 2011, Mr. Skobic noted in his journal that he began repairing more stainless steel elbows for SFS/NNS, noting that he had to build up the whole heel area and that he told Nuflo's Quality Control team we shouldn't be doing that.  Nevertheless, he was "told to go ahead and weld."  The job number for these elbows was 63600-01.  In total, Mr. Skobic noted repairs on eighteen elbows from this order, adding that for these he was "building up [the] whole heel area on every piece."

231.    On July 26, 2011, Mr. Skobic noted in his journal that he set up a 10-inch L tangent elbow so that he could weld-repair the heel in a "huge" area that measured 21 x 6 ½ inches, where the wall was ground thinner than the drawing required. This elbow was for

Electric Boat Job No. 1371T (Nuflo Job No. 63822-01). Mr. Skobic continued working on this elbow for three more days, completing it on July 29, 2011. He described the repair as a "monster clad weld" that covered "about the whole heel area."

232. On July 28, 2011, Mr. Skobic noted in his journal that he had to use welding to repair a damaged six-inch wide-neck Level 1 flange for SFS, that had the Nuflo Job No. 64622-01.

233. On October 14, 2011, Mr. Skobic noted in his journal that he had set up to repair a crack in the "prep end" of a 10-inch steel elbow for EB Order 14-00-2921 (Nuflo Job No. 62884-02) that was rated Level 1. Mr. Skobic added that the "crack is 3 [inches] long!" The "prep end" of a piping section is prepared for joining to the next section of pipe by fasteners or welding.

234. The Nuflo job number (62884-02) recorded by Mr. Skobic included six 10" elbows. The parts are associated to Electric Boat purchase order number GPV127-075 SUPP 008 ITEM 0089, part number 14-00-2921 (Mr. Skobic recorded the part number which he associated with an "order" number). Six parts are associated with the Electric Boat purchase order number on a Nuflo Certificate of Test record dated April 18, 2012. That document included a certification that the fittings had been manufactured in accordance with all applicable specifications and purchase order requirements. There are no records in the invoice package that indicate any part was weld repaired prior to shipment by Nuflo to SFS on April 18, 2012.

235. On October 17, 2011, Mr. Skobic noted in his journal that Ryan Licausi had asked him to weld repair "some 10-inch heavy wall elbows" by clad welding the heels for an SFS/NNS order, Part No. 15-07-4050. Mr. Skobic noted that these elbows had no mapping or description, and no QC inspection report. Over the next week, physical testing of the elbows

revealed several nonconformances, and Mr. Skobic noted in his journal that he welded over these indications.  He finished the job on October 27, 2010.

236.    On October 27, 2011, Mr. Skobic recorded that he was weld repairing six-inch elbows for NNS (Nuflo Job No. 65065-01) by welding up area on the heel where the wall was too thin.  Mr. Skobic also noted that the writeup for the elbows stated that no weld repair was allowed because the fitting was "nuclear grade."  Mr. Skobic continued weld repair of these elbows until November 7, 2011. On that date, Mr. Skobic noted in his journal that he was told by Tommy Connors, his then-supervisor, not to leave a paper trail for the weld repair on these elbows.

237.    On December 13, 2012, Mr. Skobic noted in his journal that he stared to weld repair half-inch elbows for "EB Order No. GPV087-035, Items 278, 279, 280, 281, 282, 283, [and] 284."  Mr. Skobic also noted that this order included "Nuclear print (RED)," but that he was nevertheless performing weld repairs on approximately 90 of these elbows in order to fix the "prep area" where the wall was under minimum thickness.  On April 4, 2013, Mr. Skobic again noted that he had set up the half-inch elbows to weld around the prep area for parts in the same purchase order (GPV087-035, Items 245-252, 273, and 274-284).  Mr. Skobic also noted that these parts were "all nuclear!"

238.    These repairs continued through April 15, at which time Mr. Skobic had repaired an additional 20 elbows.  The purchase order number and item numbers recorded in Mr. Skobic's journal correspond with Electric Boat purchase order GPV087-035 SUPP007, part number EB217003727, 0.5" Level 1 90 LR elbows.  There are multiple Nuflo job numbers associated with specific item numbers including Nuflo Job No. of 63351-01.  The parts were to be manufactured according to MIL-F-23509F specifications, which Nuflo was required to certify

-61-

completing. Nuflo's documents indicate that these parts were to be manufactured to those same specifications, yet they fail to document the weld repairs performed by Mr. Skobic.

239.     In 2013, Mr. Skobic recorded at least 894 weld repairs on Nuflo parts, including 270 elbows, 192 flanges, two laterals, one plate, 13 reducers, and 416 tees.

240.     On February 19, 2013, Mr. Skobic recorded that he had set up to weld repair the prep area on eight stainless steel three-inch extra heavy wall SR elbows for NNS (Part No. 14-07-1502A) (Nuflo Job No. 66657-01) Mr. Skobic continued performing repairs on these eight elbows through February 25, 2013. The Nuflo job number (66657-01) corresponds with an SFS purchase order (25384) for Eight Level 1 part number 14-07-1502A 3" elbows.  Nuflo was not permitted to perform any welding on stainless steel parts.

241.     Documents from SFS indicate that these parts were inspected by SFS personnel pursuant to NNS's supplier delegated inspection program and were certified as being manufactured in accordance with all applicable specifications and purchase order requirements on September 11, 2013 by the Nuflo Quality Control manager despite the weld repairs Mr. Skobic was ordered to perform on them.  At least four of the parts were shipped to HII-NNS on September 24, 2013, purchase order 4300189180.

242.     On August 7, 2013, Mr. Skobic recorded that he had set up to weld repair cracks on a number of six-inch steel elbows for EB Order No. PPZ062-090, Item 1 (Nuflo Job No. 67666-01).  Mr. Skobic added that all the cracks were on the prep end" and that the elbows were heat treated before this repair, which meant that any alteration required re-certification and re-identification.  Out of the 13 pieces in this order, Mr. Skobic repaired nine, all of which had cracks in the prep end/bevel area.  Mr. Skobic continued to weld-repair elbows through August 15, 2013.  Nuflo's records indicate that these elbows (part number 14-00-2922) were inspected

by Nuflo personnel pursuant to Electric Boat's supplier-delegated inspection program, and that all of the elbows were deemed "acceptable" and shipped from Nuflo to Electric Boat on September 6, 2013. Nuflo sent no documentation of any weld repairs.

### 4.     False Claims for Payment Submitted or Caused to be Submitted.

243.    Defendants knew that the reasonable and foreseeable result of its conduct was the submission of false claims for payment of end-items, and components, which did not conform to material requirements of their contracts.

244.    Because of the systemic lack of quality control over the manufacture, testing, assembly, and inspection of those parts, the United States cannot be confident in the conformance of Nuflo parts to the material requirements of its contracts.  The United States expended significant funds during the investigation of this matter to sample and test installed parts to ensure the safety of personnel assigned to these vessels.  The United States cannot dismantle every nuclear submarine to identify and test every Nuflo part, which were designed to last the life of the vessel.  The United States paid a premium for conformance to strict quality control requirements, and did not get what it paid for.

245.    Each claim for payment on account of a vessel which includes a nonconforming Nuflo component is false.  Moreover, each claim for payment on account of a vessel which includes payment relating to nonconforming quality control measures is false.

246.    These claims were submitted in several ways.  Under the prime contracts with the United States, Defendants were paid through mechanisms spelled out in Federal Acquisition Regulations ("FAR's), and in the Department of Defense Federal Acquisition Regulations (DFARS), which implement and supplement the FARs. These mechanisms including invoices for interim payments, called progress payments, and for the final delivery of a nuclear submarine

for acceptance by the United States.

247.    FAR § 52.232-5(b) permits the Government to make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer. Along with each request for progress payments, the Contractor is also required to furnish certification of, among other things, that:

> The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract.

FAR § 52.232-5(c).

248.    The DFARS require Defendants to prepare and furnish to the Government a receiving report at the time of each delivery of supplies or services. DFAR 252.232-7006(b). Instead of paper submission, the DFARS provide for payment requests and receiving reports in electronic form using a system called Wide Area WorkFlow (WAWF). DFAR 252.232-7003. The WAWF Receiving Report (WAWF RR) is the electronic equivalent of the more commonly known DoD delivery form, called DD Form 250, Material Inspection and Receiving Report (MIRR). See Appendix F, Material Inspection and Receiving Report, of the Defense Federal Acquisition Regulation Supplement. Whether in paper or electronic form, the Material Inspection and Receiving Form certifies to the Government conformance to contract requirements.  As made clear by DFAR Appendix F, the purposes of the WAWF or DD 250 include

> (1)    To provide evidence of Government contract quality assurance at origin or destination;
>
> (2)    To provide evidence of acceptance at origin, destination, or other;
>
> (3)    For packing lists;

(4)     For receiving;

(5)     For shipping;

(6)     As a contractor invoice (the WAWF RR, WAWF RRR, or DD Form
        alone cannot be used as an invoice, however the option exists to create an invoice
        from the Receiving Report or a Combo (Invoice and Receiving Report) both of
        which minimize data entry); and

(7)     As commercial invoice support.

F-103, Appendix F.[7]

249.    Upon information and belief, Electric Boat, as the prime contractor, submits

progress payment requests to the United States during construction of the submarine, which

certify such payments are only for conforming performance under the contract.  When a

submarine is ready for delivery to and acceptance by the Government, Electric Boat submits a

MIRR with the finished submarine which, among other things also certifies conformance to the

contract. NNS also causes the submission of such claims, pursuant to its Teaming Arrangement

with Electric Boat.  Upon information and belief, NNS, as the prime contractor for delivery of

aircraft carriers, submits progress payment requests to the United States during construction of

the carriers, which certify such payments are only for conforming performance under the

contract.  When a carrier is ready for delivery to and acceptance by the Government, NNS

submits a MIRR with the finished carrier which, among other things also certifies conformance

to the contract.

250.    Each payment request which includes payment for nonconforming parts or

services, whether through progress payments or through final delivery of a vessel, is false.  Each

Certificate of Conformance for nonconforming components, or vessels containing

---

[7] If the contracting officer authorizes the contractor to submit an invoice in paper form, the Government
encourages, but does not require, the contractor to use the MIRR as an invoice, in lieu of a commercial
form. *Id.*

nonconforming parts, on progress payment requests, or in MIRR submissions, whether electronic or in paper form, are false records created to get a claims paid in material nonconformance with prime contract provisions.[8]

### COUNT I:  FALSE CLAIMS ACT VIOLATIONS
### AGAINST DEFENDANT ELECTRIC BOAT
### 31 U.S.C. §§ 3729 *et seq.*

251.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B), imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government.

252.    Defendant EB's knowing conduct resulted in false claims for payment to be submitted to the United States, in violation of 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B).  EB knowingly violated its material contract requirements by failing to ensure that its suppliers Nuflo and SFS provided conforming product for installation on nuclear submarines. EB failed to do so in myriad ways.

253.    EB qualified Nuflo and SFS for the SDIP program to divert its oversight to the suppliers themselves.  EB continued to utilize this program notwithstanding immediate prior knowledge of another of its suppliers engaged in very similar actions in violation of the FCA. EB did not employ the oversight necessary to qualify or continue to qualify Nuflo or SFS into a program where less oversight could assure nonconforming product, even after learning that NNS had suspended Nuflo from the program for quality issues.  Moreover, EB permitted unqualified

---

[8] All resulting claims to the Navy relating to vessel construction and delivery, including the methodology for tracking specific parts and services to claims, are within the possession and control of Defendants. However, as reflected by the detailed representative examples in this Amended Complaint, nonconforming parts were procured from Nuflo and SFS by Defendants and paid for under their prime contracts with the United States.

personnel, including the owner of Nuflo, to be inspection delegates.  Under this program, EB

delegated its inspection responsibilities to Nuflo and SFS's SDI personnel, and their actions were

performed in the name of EB.  EB is liable for the conduct of SDI personnel acting on its behalf.

254.    EB failed to exercise its continuing oversight responsibilities in any meaningful

way, ignored red flags, and ignored or hid actual knowledge that Nuflo and SFS's inspections

were insufficient to ensure the delivery of conforming parts manufactured with the conditions

and specifications set forth by the United States.  This included failing to audit weld repairs

being performed at Nuflo, and recklessly and deliberately disregarding repeated warning signs

that Nuflo's quality system was nonconforming in systemic ways.  For example, even after EB

discovered minimum wall thickness violations twice in just over a month in 2009, it did not take

any enhanced measures to audit Nuflo's manufacturing system.  In fact, EB conducted just a

routine SDIP audit at Nuflo a couple months later, but did not use heightened scrutiny or require

any manufacturing process changes by the supplier.

255.    EB repeatedly and over many years failed to perform root cause analysis and

corrective action on quality nonconformances at Nuflo, including but not limited to those

resulting in Nuflo's suspension by NNS from the SDIP program from 2007 -2011.  Instead, EB

never disqualified Nuflo or engaged in concerted root cause analysis or investigation.  The

failure to root cause analysis reports includes an instance when EB discovered weld repairs on

two Nuflo products during installation on a submarine, but internally decided that event was not

a significant concern so it dd not issue a Supplier Corrective Action Report or take any other

corrective actions. It did not undertake any root cause analysis to determine why or how often its

supplier was performing undocumented weld repairs.

256.    EB's deliberate or recklessly-indifferent failure to exercise sufficient oversight over these suppliers resulted in nonconforming parts being delivered and installed on Virginia-class nuclear submarines, including without limitation the USS Minnesota (SSN-783), the USS North Dakota (SSN-784), and the USS John Warner (SSN-785).  The installed nonconforming parts were discovered only after investigation by the Government resulting from the initial complaint in this matter, *not* by EB inspectors or shipbuilders at the time of installation.

257.    As a result, EB presented or caused to be presented false or fraudulent claims to the United States for nonconforming parts or services, through progress payment requests and MIRR and invoice of a completed Virginia-class submarine pursuant to prime contracts N00024-96-C-2100, N00024-03-C-2101, N00024-09-C-2104/3, N00024-12-C-2115, and/or N00024-17-C-2100.

258.    These false claims include, without limitation:

a.    Claims for parts that EB purchased from Nuflo and/or SFS that EB had direct knowledge had been mismarked, did not meet minimum manufacture requirements such as minimum wall thickness, or had been weld repaired after Nuflo's manufacturing process caused splitting or cracking;

b.    Claims for parts that EB purchased from Nuflo and/or SFS for which EB acted with deliberate indifference as to Nuflo's manufacturing practices, including failing to conduct on-site audits or interview Nuflo's welders after discovering unauthorized weld repairs, failing to take corrective action when Nuflo and SFS failed to deliver complete and accurate records documenting the cradle-to-grave traceability of every part installed on the vessels; failing to take corrective action when Nuflo and SFS were perpetually late on the delivery of critical components, even when the backlog was so severe that it delayed the delivery of submarines to the Navy; and

c.    Claims for payment for parts for which false inspections were completed by Nuflo and/or SFS for which Nuflo and/or SFS delivered nonconforming parts because, through the SDIP program, the conduct by the delegated entity was performed in EB's name.

259.    The United States would not have paid such claims from EB if it knew that these claims for payment were false and for nonconforming parts and parts that were manufactured outside of the SUBSAFE and other quality assurance standards required by the prime contract.

260.    Defendant also caused to be made or used false records or statements material to false claims in violation of 31 U.S.C. § 3729(a)(1)(B).  As set forth herein, EB made direct certifications to the United States through its prime contract, and it is also wholly responsible for the certifications made by Nuflo and SFS acting on its behalf in accordance with the SDIP.

261.    EB's false statements include, without limitation:

   a.    Certifying to the United States that every payment requested was for products procured in accordance with the specifications, terms and conditions of the contract;

   b.    Certifying to the United States that EB complied with its contractual obligations under the prime contract to exercise oversight sufficient to ensure that only conforming parts were procured and installed on the submarines;

   c.    Certifying to the United States that EB would and did exercise appropriate discretion in selecting the suppliers to whom it delegated inspection authority under the SDIP;

   d.    Certifying to the United States that it conducted oversight and audits as required by the prime contracts and the SDIP when it either performed "desk audits" based on checklists of paperwork, and EB's on-site auditor failed to actually perform detailed on-site reviews in favor of spending time in the office of Nuflo's president, a close personal friend of the auditor;

   e.    Certifying to the United States that Nuflo was a qualified for to be an SDIP entity when it knew that NNS had suspended Nuflo for failing to perform the inspections as required;

   f.    Certifying to the United States that, when required, every part installed on the submarine had the required documentation to ensure cradle-to-grave traceability; and

-69-

      g.     Certifying to the United States that every product installed on the submarines met the minimum production requirements and standards set forth in SUBSAFE and other applicable quality assurance standards.

262.    Each Certificate of Conformance prepared by EB for nonconforming components, or vessels containing nonconforming parts, on progress payment requests, or in MIRR submissions, whether electronic or in paper form, are false records created to get a claim paid in material nonconformance with prime contract provisions.

263.    Each Certificate of Conformance prepared by its SDI personnel at Nuflo and SFS on its behalf for nonconforming components, or vessels containing nonconforming parts, on progress payment requests, or in MIRR submissions, whether electronic or in paper form, are false records created to get a claim paid in material nonconformance with prime contract provisions

264.    The United States would not have paid the claims from EB if it knew that these statements were false.

265.    Defendant EB's conduct violated material conditions of payment of the resulting claims to the United States. Defendant had knowledge that its obligations under the prime contract were material to the United States including, without limitation, due to: the plain language of the contracts; the consistent notice provided in the Government through the FARs, DFARs, Mil-Q and SUBSAFE programs, among others; its long experience as a Navy contractor; and its direct involvement in False Claims Act litigation related to markedly similar failures by a supplier in the SDIP program.

266.    Defendant acted knowingly, as that term is used in the False Claims Act. As set forth herein, Defendant EB had direct knowledge of Nuflo's manufacturing practices based on receiving weld repaired parts, nonconforming parts, and severely delayed deliveries. It also

acted with reckless indifference to Nuflo and SFS's conduct by failing to perform audits, failing to require adequate corrective actions, failure to perform root cause analysis to avoid recurrence of problems, and allowing Nuflo and SFS to continue in the SDIP program despite failures in their inspections.  EB is also responsible for Nuflo and SFS's knowing failure to produce accurate inspections and record keeping associated with the responsibilities delegated to them by EB under the SDIP. Moreover, because of the Teaming Arrangement between EB and NNS and the shared information between them, the obligations set forth in EB's prime contract flow equally to both contractors, and knowledge attributable to one contractor is equally attributable to the other.

267.    EB's knowing conduct occurred from at least 2005 through 2015, and harmed the United States as a result.

## COUNT II:  FALSE CLAIMS ACT VIOLATIONS
## AGAINST DEFENDANT NEWPORT NEWS SHIPBUILDING
### 31  U.S.C. §§ 3729 *et seq.*

268.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (B), and (C), imposes liability upon *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government.

269.    Defendant NNS's knowing conduct resulted in false claims for payment to be submitted to the United States, in violation of 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B).  NNS knowingly violated its material contract requirements by failing to ensure that its suppliers Nuflo and SFS provided conforming product for installation on nuclear submarines. NNS failed to do so in myriad ways.

270.     NNS qualified Nuflo and SFS for the SDIP program to divert its oversight to the suppliers themselves.  NNS continued to utilize this program notwithstanding immediate prior knowledge of another of its supplier engaged in very similar actions in violation of the FCA.  Even once NNS suspended Nuflo from its SDIP program for repeated quality issues, it still failed to employ adequate oversight over SFS, which continued to deliver Nuflo products.  When NNS re-qualified Nuflo again four years later, it did not employ the minimally necessary oversight, let alone any enhanced oversight, to qualify and continue qualifying the supplier into a program could assure nonconforming product.  Moreover, NNS permitted unqualified personnel, including the owner of Nuflo, to be inspection delegates.  Under this program, NNS delegated its inspection responsibilities to Nuflo and SFS's SDI personnel, and their actions were performed in the name of NNS.  NNS is liable for the conduct of SDI personnel acting on its behalf.

271.     NNS failed to exercise its continuing oversight responsibilities in any meaningful way, ignored red flags, and ignored or hid actual knowledge that Nuflo and SFS's inspections were insufficient to ensure the delivery of conforming parts manufactured with the conditions and specifications set forth by the United States.  This included failing to audit weld repairs being performed at Nuflo, and recklessly and deliberately disregarding repeated warning signs that Nuflo's quality system was nonconforming in systemic ways.  Most significantly, NNS suspended Nuflo from the SDIP because of quality issues on another project.  Still, it did not speak Nuflo's welders and did not do a focused audit on Nuflo's weld processes or quality systems.  Rather, NNS continued to purchase Nuflo's products through SFS, a supplier with common ownership to Nuflo and no independent manufacturing capabilities.

272.     NNS repeatedly and over many years failed to perform root cause analysis and corrective action on quality nonconformances at Nuflo or at SFS regarding Nuflo-manufactured

products.  NNS continued to do business with Nuflo and requalified it for the SDIP program in 2011, despite actual knowledge of nonconforming parts, parts that had been weld repaired, and extensive delays in part delivery. Even when NNS purported to require a root cause analysis – like when it discovered that 15 elbows purchased from SFS were mismarked – it did not carry through with the corrective action.  In that instance, NNS allowed the parts to be remarked and resubmitted, but no root cause analysis or corrective or preventative action plan was taken.

273.    NNS's deliberate or recklessly-indifferent failure to exercise sufficient oversight over these suppliers resulted in nonconforming parts being delivered and installed on Virginia-class nuclear submarines, including without limitation the USS Minnesota (SSN-783), the USS North Dakota (SSN-784), and the USS John Warner (SSN-785).  The installed nonconforming parts were discovered only after investigation by the Government resulting from the initial complaint in this matter, *not* by EB inspectors or shipbuilders at the time of installation.  Because NNS had prime contracts to build aircraft carriers and used Nuflo parts on those vessels, additional inspections may be required – at great cost to the United States – to independently verify that no nonconforming parts were installed on those vessels as well.

274.    As a result, NNS presented or caused to be presented false or fraudulent claims to the United States for nonconforming parts or services, through progress payment requests and MIRR, invoices of a completed Virginia-class submarine pursuant to prime contracts N00024-96-C-2100, N00024-03-C-2101, N00024-09-C-2104/3, N00024-12-C-2115, and/or N00024-17-C-2100, and invoices related to aircraft carriers pursuant to prime contracts N00024-98-C-2104, N00024-08-C-2110, and/or N00024-15-C-2114.

275.    These false claims include, without limitation:

a.      Claims for parts that NNS purchased from Nuflo and/or SFS that NNS had direct knowledge had been mismarked, did not meet minimum

manufacture requirements such as minimum wall thickness, or had been weld repaired after Nuflo's manufacturing process caused splitting or cracking;

b.      Claims for parts that NNS purchased from Nuflo and/or SFS for which NNS acted with deliberate indifference as to Nuflo's manufacturing practices, including failing to conduct on-site audits or interview Nuflo's welders after discovering unauthorized weld repairs, failing to take corrective action when Nuflo and SFS failed to deliver complete and accurate records documenting the cradle-to-grave traceability of every part installed on the vessels; failing to take corrective action when Nuflo and SFS were perpetually late on the delivery of critical components, even when the backlog was so severe that it delayed the delivery of submarines to the Navy; and

c.      Claims for payment for parts for which false inspections were completed by Nuflo and/or SFS for which Nuflo and/or SFS delivered nonconforming parts because, through the SDIP program, the conduct by the delegated entity was performed in NNS's name.

276.    The United States would not have paid such claims from NNS if it knew that these claims for payment were false and for nonconforming parts and parts that were manufactured outside of the SUBSAFE and other quality assurance standards required by the prime contract.

277.    Defendant also caused to be made or used false records or statements material to false claims in violation of 31 U.S.C. § 3729(a)(1)(B).  As set forth herein, NNS made direct certifications to the United States through its Teaming Agreement on EB's prime contracts for submarines and to the United States for its prime contracts for aircraft carriers.  It is also wholly responsible for the certifications made by Nuflo and SFS acting on its behalf in accordance with the SDIP.

278.    NNS's false statements include, without limitation:

a.      Certifying to the United States that every payment requested was for products procured in accordance with the specifications, terms and conditions of the contract;

b.   Certifying to the United States that NNS complied with its contractual obligations that flowed down from EB's prime contracts for the Virginia-class submarines and with its contractual obligations from its prime contracts for the aircraft carriers to exercise oversight sufficient to ensure that only conforming parts were procured and installed on the submarines and aircraft carriers;

c.   Certifying to the United States that NNS would and did exercise appropriate discretion in selecting the suppliers to whom it delegated inspection authority under the SDIP;

d.   Certifying to the United States that it conducted oversight and audits required of NNS by EB's prime contracts for the submarines and by NNS's prime contracts for the aircraft carriers, and required by the SDIP, when it either performed "desk audits" based on checklists of paperwork or performed otherwise insufficient evaluations;

e.   Certifying to the United States that Nuflo was a qualified for to be an SDIP entity when it had previously suspended Nuflo for failing to perform the inspections as required and did not take adequate corrective measure to ensure that the quality issues were resolved and would not recur;

f.   Certifying to the United States that, when required, every part installed on the submarine had the documentation to ensure cradle-to-grave traceability; and

g.   Certifying to the United States that every product installed on the submarines met the minimum production requirements and standards set forth in SUBSAFE and applicable quality assurance standards.

279.   Each Certificate of Conformance prepared by NNS for nonconforming components, or vessels containing nonconforming parts, on progress payment requests, or in MIRR submissions, whether electronic or in paper form, are false records created to get a claim paid in material nonconformance with prime contract provisions.

280.   Each Certificate of Conformance prepared by its SDI personnel at Nuflo and SFS on its behalf for nonconforming components, or vessels containing nonconforming parts, on progress payment requests, or in MIRR submissions, whether electronic or in paper form, are false records created to get a claim paid in material nonconformance with prime contract provisions.

281.    The United States would not have paid the claims from NNS if it knew that these statements were false.

282.    Defendant NNS's conduct violated material conditions of payment of the resulting claims to the United States.  Defendant had knowledge that its obligations under the prime contract were material to the United States including, without limitation, due to: the plain language of the contracts; the consistent notice provided in the Government through the FARs, DFARs, Mil-Q and SUBSAFE programs, among others; its long experience as a Navy contractor; and its direct involvement in False Claims Act litigation related to markedly similar failures by a supplier in the SDIP program.

283.    Defendant acted knowingly, as that term is used in the False Claims Act.  As set forth herein, Defendant NNS had direct knowledge of Nuflo's manufacturing practices based on receiving weld repaired parts, nonconforming parts, and severely delayed deliveries.  It also acted with reckless indifference to Nuflo and SFS's conduct by failing to perform audits, failing to require adequate corrective actions, failure to perform root cause analysis to avoid recurrence of problems, and allowing Nuflo and SFS to continue in the SDIP program despite failures in their inspections.  NNS is also responsible for Nuflo and SFS's knowing failure to produce accurate inspections and record keeping associated with the responsibilities delegated to them by NNS under the SDIP.  Moreover, because of the Teaming Arrangement between EB and NNS and the shared information between them, the obligations set forth in EB's prime contract flow equally to both contractors, and knowledge attributable to one contractor is equally attributable to the other.

284.    NNS's knowing conduct occurred from at least 2005 through 2015, and harmed the United States as a result.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and on its own behalf, demands judgment against Defendants, as follows:

A.      That this Court enter judgment against defendants, jointly and severally, in an amount equal to three times the amount of damages the United States Government has sustained because of each Defendants' actions, plus the maximum civil penalty for each claim made in violation of 31 U.S.C. § 3729 *et seq.*, together with the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action.

B.      That in the event the United States Government later intervenes in this action, Relator be awarded 25% of any proceeds of the claim, and that in the event the United States Government has not intervened in this action at the time of judgment, Relator be awarded 30% of any proceeds.

C.      That Relator be awarded all costs and attorneys' fees incurred in the prosecution of this action.

D.      That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

Respectfully submitted,

 /s/ Jennifer M. Verkamp
Jennifer M. Verkamp
Frederick M. Morgan, Jr.
Jillian L. Estes (Fla. Bar No. 0055774)
MORGAN VERKAMP, LLC
35 East Seventh Street, Ste. 600
Cincinnati, Ohio  45202-2015
Tel. (513) 651-4400
Fax (513) 651-4405
jennifer.verkamp@morganverkamp.com
rick.morgan@morganverkamp.com
jillian.estes@morganverkamp.com

*Counsel for Relator*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing will be served via the Court's electronic filing system and served on all counsel of record on this 31st day of January, 2020.

 /s/ Jennifer M. Verkamp
Jennifer M. Verkamp